❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Records and information associated with the cellular device<br>assigned call number 262-606-0209  (the "Target Cell<br>Phone"), that is in the custody or control of  Verizon Wireless,<br>further described in Attachment A | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.  25-908M(NJ)

Matter No. 2025R00094

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:       Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____May 30, 2025_____ *(not to exceed 14 days)*

❏ in the daytime 6:00 a.m. to 10:00 p.m.     ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Nancy Joseph_____ .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☑ for  30  days *(not to exceed 30)*     ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:      05/16/2025 9:13 am

*Judge's signature*

City and state:        Milwaukee, Wisconsin              Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.:<br>  25-908M(NJ) | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

 I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  _____

_____

_Executing officer's signature_

_____

_Printed name and title_

## ATTACHMENT A

### Property to Be Searched

1. Records and information associated with the cellular device assigned **call number 262-606-0209** (referred to herein and in Attachment B as "the Target Cell Phone"), used by Trayveon Roy, that is in the custody or control of Verizon Wireless (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 180 Washington Valley Rd, Bedminster, NJ 07921.

2. The Target Cell Phone.

# ATTACHMENT B

## Particular Things to be Seized

### I.     Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period April 1, 2025, to the present:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

   viii. Means and source of payment for such service (including any credit card or bank account number) and billing records

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone, including:

1. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

2. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical

GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

The Honorable Stephen C. Dries has also issued an order pursuant to 18 U.S.C. § 3123, dated April 25, 2025, for such information associated with the Target Cell Phone.

    c.  Information about the location of the Target Cell Phone for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

        i.  To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

        ii.  This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 21 U.S.C. § 841(a)(1), 843(b), and 846 involving Quentin Apkarian, Joey Miramontes, Trayveon Roy, and others known and unknown, during the period of April 1, 2025, to the present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are

authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Records and information associated with the cellular device assigned<br>call number 262-606-0209 ("Target Cell Phone"), that is in the custody<br>or control of Verizon Wireless, further described in Attachment A | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.25-908M(NJ)

Matter No. 2025R00094

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ District of _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 841(a)(1), 846, and 843(b) | Possession with intent to distribute controlled substances, conspiracy to distribute controlled substances, and use of a communication facility in furtherance of drug trafficking |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Haleen, Mark
Digitally signed by Haleen, Mark
Date: 2025.05.14 10:37:59 -05'00'

*Applicant's signature*

Mark Haleen, FBI TFO

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone _____ *(specify reliable electronic means).*

Date:5/16/2025 _____

*Judge's signature*

City and state: Milwaukee, Wisconsin

Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF**</u>
<u>**AN APPLICATION FOR A SEARCH WARRANT**</u>

I, Mark Haleen, being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.     I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **262-606-0209**  (the "**Target Cell Phone**"), whose service provider is Verizon Wireless ("Service Provider") a wireless telephone service provider headquartered  at 180 Washington Valley Rd, Bedminster, NJ 07921. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the Target Cell Phone.

3.     I am a sworn law enforcement officer with the Village of Mount Pleasant and a sworn Task Force Officer with the Federal Bureau of Investigation (FBI), with authority to investigate federal offenses including violations of Titles 18 and 21 of the United States Code.

4.      I have been employed as a Law Enforcement Officer with the Village of Mount Pleasant (Wisconsin) since September 2010 and a sworn Federal Task Force Officer with the FBI

1

since January 2020. I have obtained a Bachelor of Science Degree in Sociology from Central Michigan University. I have been involved in the enforcement and investigation of numerous violations of federal and state law to include drug trafficking investigations, firearm trafficking investigations, and violent crime related cases. I have personally conducted and participated in numerous investigations that have given me familiarity with the various methods that criminals use to conduct illicit firearm and narcotics transactions in violation of federal law.

5. As part of my duties, I investigate criminal violations relating to narcotics trafficking, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 21, United States Code, Sections 841, 843, and 846. By virtue of my employment as a federal task force officer and prior law enforcement experience, I have knowledge of and/or performed various tasks, which include, but are not limited to:

a. I have functioned as both a case agent and co-case agent in numerous investigations into illegal drug distribution conspiracies.

b. I have interviewed witnesses, confidential human sources (CHS) and sources of information (SOI) relative to the illegal trafficking of drugs and the distribution of monies and assets derived from the illegal trafficking of drugs (laundering of monetary instruments);

c. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States.

d. I have also relied upon informants to obtain controlled substances from dealers.

e. I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized.

f. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, fentanyl, cocaine, cocaine base, ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances.

2

g.      I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded.

h.      I know that drug traffickers often use electronic equipment and cellular telephones to conduct drug trafficking operations.

i.      I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such.

j.      I know that drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate drug trafficking.

k.      I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets to avoid scrutiny from law enforcement officials.

6.      As part of my duties, I also investigate criminal violations relating to unlawfully possessed firearms, firearms trafficking, and possession of machineguns including criminal violations of Federal firearms laws, including, but not limited to Title 18, United States Code, Sections 922, 933, and 924. By virtue of my employment as a federal task force officer and prior law enforcement experience, I have knowledge of and/or performed various tasks, which include, but are not limited to:

a.      I have functioned as both a case agent and co-case agent in several investigations into illegal firearms and machinegun possession and firearms trafficking.

b.      I am familiar with the language utilized over the telephone to discuss illegal firearms and machinegun conversion devices and know that the language is often limited, guarded, and coded.

c.      I have utilized informants to investigate the sale and possession of illegal firearms, and I have also relied upon informants to obtain illegal firearms from dealers.

d.      I know that people engaged in the illegal possession or distribution of firearms

3

often use electronic equipment and cellular telephones to conduct firearm trafficking operations.

e.  I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such.

f.  I have interviewed or participated in interviews of witnesses, confidential human sources (CHS), and sources of information (SOI) relative to the illegal possession and distribution of firearms.

7.  I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

8.  In addition to my experience in the investigation of individuals involved in federal criminal offenses, I also have knowledge and experience in the apprehension and prosecution of individuals involved in federal criminal offenses. I am familiar with and have experience in the use of devices used to commit those offenses as well as the available technology that can be used by law enforcement to assist in identifying the users of those devices and their locations.

4

9.     As such, I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

Case 2:25-mj-00908-NJ    Filed 05/16/25    Page 13 of 93    Document 1

10. The facts in this affidavit come from: my personal observations, my training and experience, my review of documents, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

11. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, §§ 841(a), 843(b), and 846 have been committed, are being committed, and/or will be committed by Quentin Apkarian, Joey Miramontes, Trayveon Roy, Joshua Ramos, and others known and unknown. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

12. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

### PROBABLE CAUSE

13. The United States, including Federal Bureau of Investigation is conducting a criminal investigation of Quentin Apkarian, Joey Miramontes, Trayveon Roy, Joshua Ramos, and others, known and unknown, regarding possible violations of Title 21 U.S.C. §§ 841(a)(1), 843(b), and 846 (Distribution of a Controlled Substance, Possession with the Intent to Distribute a Controlled Substance, Use of a Communication Facility in Furtherance of a Drug Trafficking Offense, and Conspiracy to Distribute a Controlled

1

Substance). As detailed below, members of the Apkarian Drug Trafficking Organization ("Apkarian DTO") are actively selling cocaine and fentanyl in southeastern Wisconsin.

14. In September 2024, case agents learned that Quentin Apkarian had recently been released from incarceration within the Wisconsin Prison System and had recently moved into 2322 Kae Court, Mount Pleasant, Wisconsin with his girlfriend, Kiara Ramos. Apkarian was released from custody on extended supervision for underlying offenses including Armed Carjacking and Operating a Motor Vehicle without Owner's Consent. Kiara Ramos was previously on Wisconsin Department of Corrections Supervision for Maintaining a Drug Trafficking Place from a 2019 conviction.

15. Case agents contacted the Wisconsin Department of Corrections and spoke with Gang Specialist Megan Rasmusson who reviewed Department of Corrections records and found Apkarian to be a documented Gangster Disciple gang member. Rasmusson was able to provide a known phone number of 414-550-7820 for Apkarian.

16. Case agents were able to listen to phone calls placed from the Wisconsin Prison System to Apkarian's cellular phone (414-550-7820) by incarcerated inmates. Based on my training and experience, and my review of a substantial number of phone calls placed by inmates within the Wisconsin prison system, I know that when a call is placed by an inmate, a recorded message advises the recipient that the call is coming from a prisoner and that the conversation is being recorded. Each of the prison phone calls involving (414) 550-7820 included this advisement. During those calls, case agents determined that Apkarian is likely distributing illegal controlled substances in the southeast Wisconsin area. Many of the calls were placed by Inmate Christopher Badgett, a known associate of Apkarian. Each prisoner is assigned a unique identifying number to be used

2

to place phone calls from the institution. Badgett's identifying number was used to place the calls to (414) 550-7820 and Badgett identified himself during at least one of the phone calls. During several of the calls, Apkarian and Badgett discuss illegal controlled substance distribution, how much money Apkarian is making selling controlled substances, and how Badgett is going to get back into selling controlled substances upon his release (March 2025) from prison.

17. On September 18, 2024, I requested toll and subscriber records for the US Cellular number, 414-550-7820, utilized by Apkarian, through administrative subpoena. On September 26, 2024, I received and reviewed the requested records from US Cellular which showed the account subscriber for (414) 550-7820 to be Andrea Apkarian, with Quentin Apkarian as an authorized person on the account. A review of Apkarian's social media accounts and Department of Corrections records shows Andrea Apkarian to be the sister of Quentin Apkarian. Additionally, the US Cellular records also showed mobile number 414-550-8124, a number used by Apkarian DTO member Joey Miramontes, to be listed on the same account. I later administratively subpoenaed records for Verizon Wireless number 414-345-7141 and learned that the listed subscriber is Trayveon Roy.

18. On March 27, 2025, the Honorable Stephen C. Dries, Magistrate Judge for the Eastern District of Wisconsin, authorized the use of pen register/trap and trace device for 414-345-7141 (Roy). On April 1, 2025, Judge Dries signed an order for prospective prevision location data (pings) for 414-345-7141. In early April 2025, case agents found Roy to be no longer utilizing 414-345-7141. I contacted the Wisconsin Department of Corrections and learned Roy had a replacement phone number (262-606-0209—**TARGET CELL PHONE)** that Roy was utilizing to contact his probation agent. I also queried 262-

3

606-0209 **(TARGET CELL PHONE)** through CashApp and found the phone number linked to account with the user name "Bigdaddy Tray" with a photograph of Trayveon Roy. I conducted an analysis of the call records for (414) 345-7141 and (262) 606-0209 **(TARGET CELL PHONE)** and found significant overlap in contacted individuals including known associates and consistent communications patterns which is also indictive that Roy is now utilizing (262) 606-0209 **(TARGET CELL PHONE)**. On April 23, 2025 Judge Dries authorized the use of a pen register/trap and trace device on 262-606-0209 **(TARGET CELL PHONE).**

19.      Special Agents of the Federal Bureau of Investigations and local officers have received information concerning the illegal drug trafficking activities of members of the Apkarian DTO from a confidential human source ("CHS#1"):

a. CHS#1 has been reporting to the Federal Bureau of Investigations since approximately September of 2024. CHS#1 is cooperating in exchange for monetary consideration. To date, CHS#1 has received $21,243.72 in monetary compensation for his/her cooperation with the FBI. Certain information provided by CHS#1 concerning this investigation has been corroborated from external sources, including consensually recorded audio and visual recordings, multiple controlled narcotics purchases, and a review of information contained within law enforcement databases. CHS#1 is a convicted felon and has a criminal history that includes prior misdemeanor convictions for traffic offenses, Bail Jumping, Disorderly Conduct, Possession of THC, Resisting an Officer, and Retail Theft. CHS#1 has prior felony convictions for Burglary and Bail Jumping. CHS #1 has a pending criminal traffic charge for operating a vehicle after revocation. CHS#1 is cooperating with other law enforcement officers in hopes of receiving consideration on that open criminal traffic matter. I have discussed CHS#1 cooperation with the other law enforcement officer and CHS#1 has provided reliable cooperation to that agency. CHS #1 has no criminal convictions in the past five years. At no time during CHS#1's

4

cooperation with the FBI have I found CHS#1 to have provided false information or engage in untruthful or deceptive behavior. As further detailed below, during controlled narcotics purchases, CHS#1 surreptitiously recorded the narcotics transactions at my direction. Case agents later debriefed CHS#1 concerning what occurred during each transaction and then compared CHS#1's version of events with the recordings and case agent observations. Each time, CHS#1's information was corroborated by these independent sources. The basis of CHS#1's information detailed below is CHS#1's own personal observations and participation on the controlled narcotics purchases. Within the context of the information detailed and relied upon for purposes of this application, I believe that CHS#1 is credible and that CHS#1's information is reliable.

20.     Based on my training and experience, I know a "controlled buy" is a law enforcement operation in which an informant (such as CHS#1) purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, s/he is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and/or a monitoring device. When the transaction is completed, the informant meets cases agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. A sample of the suspected drugs is then field tested by the case agents for the presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. If applicable, all of the calls to the target by the informant are consensually recorded calls under the direction and control of case agents and made in the presence of case agents. Additionally, case agents observe the informant dial the target's number on each occasion and the contact is verified through

5

telephone records. When communication between the informant is done via electronic means (such as use of Facebook Messenger), case agents review the electronic communications, verify the user/profile names involved, and maintain a copy of the communications as part of the case file. Unless otherwise noted, the controlled buys and telephone contacts summarized below were conducted pursuant to the above procedures. Further, unless otherwise noted, all drug results are based on presumptive field testing and field weights without packaging.

21. Between October 2024 and May 1, 2025, CHS#1 conducted at least 21 controlled buys from Apkarian DTO members for marijuana, cocaine, fentanyl, methamphetamine, firearms, and/or a machinegun conversion device.[1] The most recent buy is detailed below. Originally, CHS #1 communicated with DTO members through Facebook, but CHS#1 was eventually provided with contact telephone numbers for Apkarian and Miramontes. On January 13, 2025, CHS #1 was engaging in a Facebook Messenger conversation with Miramontes when Miramontes provided CHS # 1 with Miramontes' cellular phone number (414) 550-8124. On February 27, 2025, CHS #1 messaged Apkarian through Facebook and requested Apkarian's phone number and Apkarian provided phone number (414) 550-7820. I later reviewed these consensually recorded messages between CHS #1 and Apkarian and CHS #1 and Miramontes and confirmed that the telephone numbers provided were, in fact, (414) 550-8124 and (414) 550-7820. CHS #1 continued to conduct buys into Apkarian DTO members.

---

[1] Based on my training and experience, I know that: Machinegun Conversion Devices (MCDs) are defined as machineguns under the National Firearms Act, even when not installed. MCDs include traditional "Drop In Auto Sears" (DIASs), which are designed for use on AR-type firearms, and more recently developed "switches," which are designed for use on certain semiautomatic pistols. MCDs are easily integrated with semiautomatic firearms to illegally convert them to fire automatically.

6

22. Based on my training and experience, and the investigation to date, I believe that Trayveon Roy is Apkarian/Miramontes' supplier for fentanyl pills and potentially methamphetamine. Roy is the user of Wisconsin based telephone number (262) 606-0209 (**TARGET CELL PHONE**). Roy is a known associate of Apkarian and has a last known address of 3018 N. Palmer Street, Milwaukee, Wisconsin, 53212. Roy has juvenile Felony adjudications for Armed Robbery (Date of Adjudication 09/06/2015), Armed Robbery (Date of Adjudication 09/06/2015), Burglary (Date of Adjudication 07-05-2017) and has adult felony convictions for Prisoner Expel Bodily Substances (Date of Conviction 08-24-2018), Adjudicated Delinquent Possess Firearm (Date of Conviction 08-09-2021), and Drive or Operate Vehicle without Owner Consent (Date of Conviction 01-19-2024). Roy is currently on Department of Corrections Supervision.

23. Case agents believe Roy was the user of (414) 345-7141 because: (1) Roy provided this number to the WIDOC as his phone number; and (2) as of March 2025, (414) 345-7141 was linked to a CashApp account with the username "Bigdaddy Tray" with a photograph of Trayveon Roy. Case agents are aware from ongoing court authorized pen register/rap and trace records for (414) 345-7141 that Roy stopped using (414) 345-7141 on or about March 31, 2025. Case agents believe that Roy obtained a replacement phone number, (262) 606-0209 (**TARGET CELL PHONE**).

24. Case agents believe Roy to be the user of (262) 606-0209 because: (1) (262) 606-0209 is the number Roy has used to contact his probation agent as recently as late April 2025. Roy engaged in text message conversations with that agent as recently as April 22, 2025, using (262) 606-0209; (2) (262) 606-0209 now is the phone number that links to the CashApp account with the user name "Bigdaddy Tray" with a photograph of Trayveon Roy. As noted above, this account was previously associated with Roy's prior known

7

telephone number; and (3) I conducted an analysis of the call records for (414) 345-7141 and (262) 606-0209 and found a significant overlap in contacted individuals including known associates and consistent communications patterns which is also indictive that Roy is now utilizing (262) 606-0209.

25. On March 6, 2025, at the request of case agents, CHS #1 exchanged consensually recorded Apple iMessages with Apkarian via 414-550-7820. CHS#1 also engaged in unrecorded Facetime calls with Apkarian. CHS#1 began making arrangements with Apkarian through Apple iMessages and Facetime calls to purchase 1000 pills of fentanyl (K-Pack). I reviewed the administratively subpoenaed toll records for 414-550-7820, 414-550-8124, and (414) 345-7141 (Roy's old number) and found that while CHS #1 and Apkarian were engaged in the iMessage conversation, Apkarian (414-550-7820) placed two outgoing voice calls to (414) 345-7141 (Roy) and received one incoming call from (414) 345-7141 (Roy) between 11:29AM through 12:03PM. Two of the three calls appear to have connected, and the lengths of these calls were 1:00 minute (Apkarian to Roy), 0:03 seconds (Roy to Apkarian), and 2:13 minutes (Apkarian to Roy). Based on my training and experience, I believe that each of these connected calls involved Apkarian contacting Roy to obtain fentanyl pills. The next call made by (414) 345-7141 (Roy) was to (618) 681-7663 (Isaac Sawyer). Administratively subpoenaed toll records for (414) 345-7141 (Roy) show an outgoing call to (618) 681-7663 (Sawyer) at 1:53PM which lasts one minute until (414) 345-7141 (Roy) adds 414-550-8124 (Miramontes) to the call and merges the calls into a three-way conference call. Over the next two hours, 414-550-8124 had three additional connected voice calls with (414) 345-7141 (Roy) and the duration of those calls were 1 minute and 24 seconds, 5 minutes and 20 seconds, and 1 minute and 37 seconds. Roy had four additional connected voice calls with (618) 681-7663 (Sawyer) and the

8

duration of those calls were 1 minute and 20 seconds, 40 seconds, 1 minute and 4 seconds 1, and 5 minutes and 1 seconds. One of the above connected voice calls was a conference call with 414-550-8124, (414) 345-7141 (Roy) and (618) 681-7663 (Sawyer) which lasted 5 minutes and 17 seconds. I believe, based on my training and experience, that Roy had to contact Sawyer to fulfill the 1000 pill order and Sawyer and Roy are working together to distribute the fentanyl pills. I also believe, based on my training and experience, that Miramontes was added to the three-way call involving Sawyer and Roy because Miramontes was the person who was to acquire the fentanyl pills, and this call was to discuss the terms and location for the fentanyl deal. On March 7, 2025, case agents met with CHS #1 at approximately 10:30AM and provided CHS #1 with $5200 in buy money and audio/video recording equipment. CHS #1 was followed to the buy location where Miramontes and Apkarian were waiting in Apkarian's Gray BMW X2 (AXP7072) (hereinafter "BMW") in the parking lot.2 Physical surveillance observed the BMW exit the interstate and enter the lot at approximately 11:10AM. Physical surveillance observed Miramontes enter CHS #1's vehicle while Apkarian stayed in the BMW. Inside the vehicle, according to CHS #1, Miramontes produced the bag of fentanyl pills from his pocket and provided them to CHS #1 in exchange for the $5200. During the controlled buy, Miramontes said that he did not know what a "K-Pack" looked like and stated, "if it's short let us know so we can get up on them." Based on my training and experience, I believe this statement involved Miramontes telling CHS#1 that if there were fewer pills than they bargained for ("short") that CHS#1 should tell Miramontes so that Miramontes can contact his suppliers (in context, Roy and/or Sawyer) to remedy the situation ("…so

---

2 I checked Wisconsin Department of Transportation (WIDOT) records for the BMW X2 with Wisconsin registration AXP7072 and learned that it lists to Apkarian and K. Ramos at 2322 Kae Court.

we can get up on them…"). This conversation was consensually recorded by CHS#1, preserved, and confirmed by case agents. Case agents later field tested, weighed, and counted the fentanyl pills and found the total weight to be 88.1 grams and a fentanyl swipe test revealed a positive reaction for the presence of fentanyl. Case agents counted the pills and found the total to be 770. Case agents alerted CHS #1 of the shortage and requested CHS #1 call Apkarian and complain. After CHS #1 called Apkarian to complain, in sum, I believe that Apkarian told CHS #1 that he would call Miramontes and have Miramontes call the supplier. After the phone call with CHS #1, administratively subpoenaed toll records show Apkarian ((414) 550-7820) called Miramontes ((414) 550-8124). This connected voice call lasted 15 seconds. Miramontes ((414) 550-8124) then, in turn, contacted (414) 345-7141 (Roy). This connected voice call lasted 1 minute and 32 seconds. Then, in turn, (414) 345-7141 (Roy) immediately contacted (618) 681-7663 (Sawyer) and conferenced in Miramontes ((414) 550-8124). This connected voice call lasted 1 minute and 33 seconds. Shortly after this conference call, Miramontes ((414) 550-8124) has another connected voice call to (414) 345-7141 (Roy) which lasts for three minutes and 13 seconds. I believe this pattern of calls shows that Apkarian and Miramontes needed to reach out to the supplier of the pills (Roy) in order to address the shortage and that, in turn, the supplier (Roy) contacted his supplier (Sawyer) to source more pills. On March 7, 2025, at approximately 3:36PM, Apkarian sent an iMessage to CHS#1. In said message, Apkarian told CHS #1 that, "Bro hitting them up now". At approximately 5:38PM, Apkarian messaged CHS #1 and told CHS#1 that the supplier has 100 of the shorted pills and is going to make the remaining 100 ("Ok bro just holla at him I guess he got a 100 now and got to make the other 100 but bro sweating him so we on his ass."). Pen register/trap and trace records show that Miramontes ((414) 550-8124) had connected voice calls with

10

(414) 345-7141 (Roy) at 4:49PM, 5:24PM, and 5:42PM. The duration of those calls were 41 seconds, 18 seconds, and 32 seconds. Those records also show that Miramontes ((414) 550-8124) had a connected voice call with (618) 681-7663 (Sawyer) at 4:23PM which lasted 3 minutes and 26 seconds. On March 8, 2025, Apkarian contacted CHS#1 and arranged to meet at a hotel parking lot to supply the shorted pills. At 11:08AM, physical surveillance observed a vehicle registered to Apkarian arrive in the parking lot. CHS #1 arrived shortly after and Miramontes exited the vehicle and entered into CHS #1's vehicle. During the controlled buy, Miramontes provided CHS #1 with a knotted baggie of fentanyl pills and explained to CHS #1 how Miramontes was able to get the supplier to acquiesce and make up the difference. The conversation between CHS#1 and Miramontes was consensually recorded and reviewed by case agents. During the controlled buy, Miramontes talked about the supplier ("Yeah that's bullshit. Yeah, I got on, I had to get on nigga ass and shit."). Miramontes explained that he told the supplier that he needed another 1000 pills (K Pack) so the supplier would meet ("I go right over there. I, I didn't take the K-pack, but I just told him I was like bring, I was like bring a K-pack cause that's the only way I was gonna be able to (UI).") When Miramontes met with the supplier, Miramontes planned to take the missing 200 pills from the 1000 pill K Pack ("So, I should of took the K-pack. But I told him straight up, I was like yeah nigga uh, them bitches was short 200." and "And he was like, he was like damn uh I didn't count em but my bitch counted em this and that, I was like I don't care who counted em.") Miramontes had the supplier count out the 200 pills ("…I was like, nigga they were short you know they were short. And he was like this, he's like man, man here bro, here he like counted out the (UI), he was like here count them up take 200 out of here. I was like you can count them bitches I'll take 200, I was like I ain't gonna touch them bitches, cause I had my daughter in the

11

car. So I was like man you count them bitches out."). Miramontes confirms that he was not previously acquainted with the supplier and that this is Apkarian's connection ("…I don't know that, bro I don't know that nigga and shit but the only, the only way I know him and shit, is through bro and shit, and I really don't, the first time I ever met him and shit was the time I grabbed the pack the K-pack."). After Miramontes exited CHS#1's vehicle, CHS#1 met with case agents. CHS#1 turned over the suspected pills to case agents. The suspected fentanyl was later field tested positive for the presence of fentanyl, weighed approximately 21.1 grams, and was placed on inventory.

26. I reviewed administratively subpoenaed phone records for (414) 550-7820 and (414) 550-8124 from February 11, 2025 through March 5, 2025. The records show that the only contacts between (414) 345-7141 (Roy) and (414) 550-8124 (Miramontes) in that time period occurred on March 3, 2025 coinciding with the first fentanyl pill controlled buy with CHS #1. The records also show that (414) 550-8124 has had only 13 voice calls with (618) 681-7663 (Sawyer) during the same time period. (414) 550-7820 (Apkarian) has had 28 voice calls with (414) 345-7141 (Roy) and 0 voice calls with (618)-681-7663 (Sawyer) during that time period. The lack of voice calls between (414) 550-8124 (Miramontes) and Roy leading up to the fentanyl controlled buys is consistent with Roy being the source of supply of the fentanyl. Specifically, Miramontes told CHS#1, as detailed above, that Miramontes had met the fentanyl supplier for the first time when he obtained the fentanyl pills. The lack of earlier phone contact between Roy and Miramontes is consistent with Roy being the fentanyl supplier to whom Miramontes was referring. Based on my training and experience, and the circumstances of the March 6, 2025 and March 8, 2025 buys, I believe that Sawyer and Roy are drug suppliers for the Apkarian DTO.

12

**Controlled Buy of Methamphetamine and Firearm (April 28, 2025 to April 30, 2025**

27. In sum, on April 28, 2025, CHS#1 communicated with (414) 550-7820 (with both Apkarian and Miramontes using (414) 550-7820 together) to arrange to purchase a Stoger SR9 firearm and discuss methamphetamine and the price of cocaine. Eventually, it was learned that the Stoger SR9 firearm was not currently available for purchase. As the conversations progressed, on April 29, 2025, and April 30, 2025, CHS#1 communicated exclusively with (414) 550-8124 (Miramontes) and arranged to purchase methamphetamine, a different firearm, and a machinegun conversion device (switch) from Miramontes. Unlike other buys with the Apkarian DTO, it does not appear that Apkarian was personally involved in the drug (methamphetamine) aspect of the April 30, 2025, controlled buy, as it appears that Miramontes went to potential drug sources of supply without first going through Apkarian. Based on Miramontes' statements to CHS#1, I believe that Miramontes wanted to keep the methamphetamine deal a secret between Miramontes and CHS#1 (and not inform Apkarian). I suspect this is because Miramontes wanted to keep the profit for himself.

28. On April 28, 2025, at 2:48PM, CHS #1 received an incoming voice call from (414) 550-7820 (Apkarian). The call was captured via the consensual recording of CHS#1's telephone number and reviewed by case agents. I confirmed that this call occurred with (414) 550-7820 by reviewing the court authorized pen register/trap and trace data for (414) 550-7820. During the call, Miramontes can be heard in the background. I believe that Apkarian is the user of (414) 550-7820 during this call as I have reviewed dozens of recorded calls and controlled buy recordings, and I can recognize his voice. I believe Miramontes is the person in the background as I have also reviewed recorded calls and controlled buy recordings and can recognize his voice as well. Below is a transcription of the relevant portion of the call:

13

**APKARIAN:** "What's the word?"

**CHS #1:** "Yeah, what you up to?"

**APKARIAN:** "Shit, just getting this motherfucking pack together."

**CHS #1:** "Oh yeah?

**APKARIAN:** "Yeah. Went and just copped some reals out. Fire dude.

**CHS #1:** "Oh yeah?

**APKARIAN:** "Hell yeah."

**CHS #1:** "What you grabbing the P's for now?"

**APKARIAN:** "Shit, this shit right here, it was like 17. But that's just some reals right there. Ain't no bullshit. This right here, $40 tray five, pressure. Yeah. Yeah, them niggas don't yowder over there?

**CHS #1:** "Not right now. Oh. I don't know. What's happening, man? Super low. Just chillin'. I'm trying to get some good going. That nigga done got some good going on this shit."

**APKARIAN:** "His numbers look a little lighter and shit than the last shit."

**CHS #1:** "I don't know if it's... If that's really... I mean... Ain't really no money in it for me right now, you know?"

**APKARIAN:** "Yeah."

**CHS #1:** "I'm trying, I'm trying though."

**APKARIAN:** "That's what I'm saying, if you can get us lower numbers, there will be some paper in for you."

**MIRAMONTES:** "It's a Stoger SR9." (in background)

**APKARIAN:** "Oh, a Stoger. It's a Stoger SR9.

**CHS #1:** "It's a what SR9?"

14

**APKARIAN:** A Stoger."

**CHS #1:** "Stoger SR9, never heard of that."

**MIRAMONTES:** "Yeah, and it got a .50 on it."

**CHS #1:** "Is it a handgun?"

**MIRAMONTES:** "Yeah, it's a 9."

**APKARIAN:** "It's a 9."

**CHS #1:** "What's the brand? Stoger? Stroger?"

**MIRAMONTES:** "Stoger SR9."

**CHS #1:** "Damn. How much you guys want? That's the only one, or what?"

**APKARIAN:** That's the only one around right now, shit. We told them we'll let them know. Yeah, it looks like Glock its fat."

**CHS #1:** "How much you want for it though, because it's got to be a couple of dollars in it for me. Before, I was just grabbing shit to grab it, pretty much, because money was around. Now, these motherfuckers, they got to start paying me a little bit more."

**APKARIAN:** "Yeah, they got to, bro. That's what I been telling you bro. Trying to get these better numbers."

**MIRAMONTES:** "I' just message them back, I'll tell them how much you want for that bitch."

**CHS #1:** "Yeah, let me know for sure. If you, uh, I'm not sure if I'm for sure yet, but I just want to throw the ticket for sure."

**APKARIAN:** "Like on them blues, them motherfuckers already gone. Them niggas ain't, you know what I'm saying? They be running through them."

**CHS #1:** "Somebody must have hit a lick to get them that low. I mean, I've heard of that low, but they don't be the hitters."

**APKARIAN:** "My nigga and shit, I guess his cousin, like he make them and shit too, but I guess he finessed his, uh, one of the other niggas, I don't know if he put them on, how to make them or what, but he snatched like 5,000 of them bitches from dude, bro."

**CHS #1:** "For real?"

**APKARIAN:** "Yeah. And they're all gone already, they're all gone."

**CHS #1:** "Yeah, 5,000."

**APKARIAN:** "What it was, was I think he sold, I think he sold his, uh, presser to a dude. And then, um, I don't know what happened, because I think he was tight on money or something, so he sold his operations to him. And then I think he doubled back and went over there and took his shit back in, everything the dude made and shit."

**CHS #1:** "Oh, shit."

**APKARIAN:** "He did some shit. Oh. And then he hit us up, and he was like, yeah, bro, I got these bitches for the low shit. I ain't put no money in this shit. Like, yeah, I was like, bro, I don't grab them because they think I be out here dumping them. I be trying to tell them, like, bro, I don't buy these from y'all and just be out here selling them one by one."

**CHS #1:** "Yeah, yeah. It's just a one-hit thing."

**APKARIAN:** "I ain't got time to be sitting out here dumping them bitches."

**CHS #1:** "Yeah, because those things are dangerous, too, man. I mean, there's just so much shit going on behind those things."

**APKARIAN:** "I was talking about that earlier. Like, man, that's why I don't like dealing with some bitches, bro. I know my man, and shit just told me earlier he could get me, like, a split for, like, anywhere from probably, like, $3,000 to $3,200 to $3,000.

**CHS #1:** "Yeah. [UI]"

16

**APKARIAN:** "And my man's already checked it out. I brought a motherfucker over there to do it. I said, my Guy, he be blowing that shit. He said that shit dropped, too."

**CHS #1:** "Yeah. I probably be any more interested if y'all could see what's up with that glass. I got somebody online with that that I could probably get going, because…"

**APKARIAN:** "Well, tell me how much, because we're not really that familiar with that shit like that."

**CHS #1:** "Me neither. That's why I don't want to bite my own head, either."

**APKARIAN:** "[UI] I don't want to just go find that, and that nigga be like, oh, give me 4G for this. I don't know about that shit, though. My bro know about that shit, he know about that shit."

**CHS #1:** "I don't know. I don't know much. I just know what he told me."

**MIRAMONTES:** "That nigga Poison, he cook that shit, bro. He be making that shit."

**APKARIAN:** "Oh, we can get the wax, too, though, nigga. You don't know nobody fuck with that wax?"

**CHS #1:** "Not really. Not right now, no. That shit, the wax, the edibles, the fucking oils, all that shit is just starting to wash up. Everybody just want regular flower again."

**APKARIAN:** "Yeah, we got that shit, too, nigga. I'm telling you, you always got to keep some weed on deck, because everywhere you go, you can at least sell a dub to a nigga for $25, $30. That's why I always keep that shit around, wherever I go."

**MIRAMONTES:** "I know for a fact, bro. If you take a zip of that shit up to Green Bay, Sheboygan, and up there, nigga, you're selling zips, nigga, for like $1,200."

**CHS #1:** "Of that? But you're getting zips for what? Like three?"

**MIRAMONTES:** "You're getting zips, back then, that was for three. I know now, nigga, it's like more up because everybody's locked up. There ain't no cooks."

17

**MIRAMONTES:** "They got a sting.  That's the next thing you got to worry about, bro. You got to worry about the meg unit, nigga. They got a unit called the meg unit, nigga, that's specialized just in that. They own it, nigga."

**CHS #1:** "Everybody who cooks this shit pretty much, huh? Yeah, you basically got to have somebody that's a cook."

**CHS #1:** "Yeah, and that's hard to find, huh? That's if you're trying to do some Breaking Bad shit, too. I'm just trying to get a couple of zips."

**APKARIAN:** "It's the nigga buying it from the cook, then it's the nigga buying either, you know what I'm saying, pounds of that shit or half pounds of that shit."

**CHS #1:** "Like, what's the main ingredient that gets a motherfucker high in some glass? And what's that in? Where do they get that from?"

**MIRAMONTES:** "That MDMA, bro, it's all types of shit in there, nigga. Yeah, it's chemicals and gas. That's what gets ecstasy pills going, nigga. It's got too much dopamine in it.

That's why when you take that shit, bro, motherfuckers that take that shit, they right away get to trying to fuck, bro.  I swear to God, nigga, I'm not lying, bro, nigga. [UI}"

**MIRAMONTES:** "I got to get a hold of Twiggy, bro."

**APKARIAN:** "You said what? Yeah, he got to get a hold of these guys, shit, and then we're gonna see what they can come up with."

**MIRAMONTES:** "Listen, bro, I know this nigga that stays up in fucking... He stays up in fucking Wausau, right?"

**CHS #1:** "Yeah"

18

**MIRAMONTES:** "And he cooks, bro, and he's hot right now and shit. The only thing is, is I never sent him a friend request and I never messaged him yet, and this is one of my guys, like, when we was in the joint, nigga, I went and he went with me, nigga."

**CHS #1:** "All right, all right."

**MIRAMONTES:** "Like, he valid, and he know his shit, nigga. They used to deny him science books, nigga, in the joint because he was over there making notes, nigga, about when he gets out, how he was gonna cook his shit. And he's out right now, nigga. This nigga named Jason. If we get this nigga on deck, bro, swear to God, nigga, we'll be paying this nigga, he'll cook that shit for us, nigga, and you can lock in with him. They're called contracts, bro.

You gonna tell you, you want to do a contract? I'm gonna lock you. You lock in, nigga, he gonna write, make your shit, nigga, for six months straight, nigga, and then he's gonna move on to the next person that he fuck with, and then do it for..."

**CHS #1:** "And then they tell you, like, how much they're gonna make within that six months type of deal, too huh? Gotta have the motherfuckers online to grab it."

**CHS #1:** "That might be one of the runs that motherfuckers need to go on, too.

**APKARIAN:** "If he can take over over there, we can write takeover over here. It's just that crowd, man."

25. Based on my training and experience, I believe that Apkarian and Miramontes have access to a Stoger 9mm firearm to potentially sell to CHS #1 ("Oh, a Stoger. It's a Stoger SR9"), but they do not yet have a price. Miramontes tells CHS #1 that he has a friend who makes methamphetamine in the Wausau area with whom Miramontes was incarcerated ("And he cooks, bro, and he's hot right now and shit. The only thing is, is I never sent him a friend request and I never messaged him yet, and this is one of my guys, like, when we was in the joint, nigga, I went and he

19

went with me, nigga."). Apkarian tells CHS #1 that the price of cocaine went down, and Apkarian could get a split of cocaine for a lower price than during previous transactions ("I was talking about that earlier. Like, man, that's why I don't like dealing with some bitches, bro. I know my man, and shit just told me earlier he could get me, like, a split for, like, anywhere from probably, like, $3,000 to $3,200 to $3,000.").

26. On April 29, 2025, at the request of case agents, CHS #1 placed a consensually recorded phone call to (414) 550-8124 at 11:50AM and spoke with Miramontes to discuss the purchase of methamphetamine. The call was captured via the consensual recording of CHS#1's telephone number and reviewed by case agents. I confirmed that this call occurred with (414) 550-8124 by reviewing the court authorized pen register/trap and trace data for (414) 550-8124. I believe that Miramontes was the user of (414) 550-8124 during all of the below-described phone calls (April 29, 2025, and April 30, 2025) because I recognize his voice and speech pattern from prior controlled buys, and Miramontes later showed up and delivered the methamphetamine, machinegun conversion device (switch), and firearm to CHS #1. Below is a transcription of the relevant portion of the call:

**MIRAMONTES:** "I just got ahold of my guy and shit bro, my guy, the one I told you that's up there cooking that shit."

**CHS #1:** "Yeah, Yeah."

**MIRAMONTES:** "What's that called? Yeah… bro what's that called? Umm, I just hollered at my guy nigga and he just told me and shit that he can get em and shit. He said, but the only thing is bro, that nigga only… he's charging six bro, But you still… but he said that you… he said that you should be able to charge a motherfucker like 13 for that shit, nigga. So you… there's enough room for you to make some, make some duckies, bro."

**CHS #1:** "What, like 6 G's a P?"

**MIRAMONTES:** "No, it's it's it's 600 an ounce."

**CHS #1:** "God damn."

**MIRAMONTES:** "Yeah, nigga that's why I told you nigga, it's because all the doctors are, not the doctors... all the cooks nigga... everybody's locked up my nigga. So that shit like at high demand my nigga because you can't get it like that."

**CHS #1:** "Yeah."

**MIRAMONTES:** "If you do get it, if you do get, it's ass."

**CHS #1:** "Right."

**MIRAMONTES**: "And I don't… that's why I called you first because I don't want to grab no shit my nigga. You know what I'm saying if you don't need it, but it's… he said he got him on deck and shit, that's just what he charging and shit."

**CHS #1:** "Yeah shit, I don't even know if that's going to be any room for me to make any money though."

**CHS #1:** "I don't know because I don't know what dudes… what dudes paying for it."

**MIRAMONTES:** "Yeah, call dude… call dude and shit and then you just let him know how much you're saying."

**CHS #1:** "Right."

**MIRAMONTES:** "If I was you… if I was you I'll call dude and shit and I even tell him like bro, look, be like I get you a zip right now and shit, but the nigga need 12."

**CHS #1:** "Right but…"

**MIRAMONTES:** "You know what I'm saying, that way… that way you make… you make you you… saying a couple dollars more and he said it's fired too. And I believe him too cause that nigga really do that shit too."

21

**CHS #1:** "Yeah, but you remember I told you dude came from… dudes from down there so he probably (UI) knows (UI) crazy (UI) prices. He probably look at me and be like, what the fuck?"

**MIRAMONTES:** "Yeah but…"

**CHS #1:** "Well, how much you think is…"

**CHS #1:** "Let me um, let me make a couple calls and I'll let you know in a second."

**MIRAMONTES:** "Make a couple calls and you let me know and shit right away and shit because I'm finna call, I'm gonna call him and shit and I'ma just let him know. That's the only problem though… the only problem is is that… the only problem is I'ma have to go grab it my nigga and that's all the way up in fucking what's that called… Wausau."

**CHS #1:** "God damn."

**MIRAMONTES:** "I'll take, I'll take the little trip if you really need… I'll take the little trip and shit because I got… I got a little… I got a little yeah… I got a little yeah up there."

**CHS #1:** "Yeah, so how much is the ticket going to be for me then, total for a zip? Six?"

**MIRAMONTES:** "It's six, it's six for a zip."

**CHS #1:** "and that's… that's… that's what I'ma give you for it?"

**MIRAMONTES:** "Yeah, that's what you gonna… that's what you gonna give me for and you just tell dude 12, you gonna make you… you gonna make you a six profit."

**CHS #1:** "All right, I'm trying to see what they… what they're talking about."

**MIRAMONTES:** "All right, holla at them and shit because if if you can't make no dollar off of it, then it ain't (UI)."

**MIRAMONTES:** "But what's that called… If you and if you… if he does want to grab it, let me know because I got a bitch that's up there and shit bro, and I'll go up there and see that bitch and then I'll just drive back. I'll grab that on the way back."

**CHS #1:** "All right bet. Yeah let me see then real quick."

**MIRAMONTES:** "And shit uhh, that… that Stoeger… that Stoeger 9 on the floor and shit so let me know and shit."

**CHS #1:** "(UI) how much though?"

**MIRAMONTES:** "That, the nigga said he wants six for that motherfucka too. Which is not bad for a nine, It got a 50 on it and all that other shit so."

**CHS #1:** "Damn, alright. Let me see umm…"

**MIRAMONTES:** "That's better than the last price because he wanted, the nigga wanted more for that and then I didn't hit him back because it wasn't no money to be made right there and then that nigga told me today that nigga say he'll let that bitch go for six."

**CHS #1:** "but shit, if if you went to… if you went to Wausau to grab that though, how long would the move take.?"

**MIRAMONTES:** "It's a, from here to Wausau is like two, It's like two and a half hours. I can make it like a hour and a half if I'm driving fast enough and shit, depends how the… it depends how the freeway is and shit."

**MIRAMONTES:** "You just let me know. I'm really running on your terms."

**CHS #1:** "Alright bet, I'll let you know for sure though."

**MIRAMONTES:** "Alright, Let me know."

**CHS #1:** "Alright"

**MIRAMONTES:** "Alright love."

27.     Based upon my training and experience, I believe that in this call Miramontes is telling CHS #1 that Miramontes has a methamphetamine source who is manufacturing methamphetamine ("I just got ahold of my guy and shit bro, my guy, the one I told you that's up there cooking that shit").  Miramontes tells CHS #1 that the price will be $600 per ounce of

23

methamphetamine ("No, it's it's it's 600 an ounce."). Miramontes also offers a Stoeger 9mm firearm for sale to CHS #1 for $600 ("And shit uhh, that… that Stoeger… that Stoeger 9 on the floor and shit so let me know and shit." And "That, the nigga said he wants six for that motherfucka too. Which is not bad for a nine, It got a 50 on it and all that other shit so.").

28. On April 29, 2025, at the request of case agents, CHS #1 placed a consensually recorded phone call to (414) 550-8124 at 11:59 AM and spoke with Miramontes to discuss the purchase of methamphetamine. The call was captured via the consensual recording of CHS#1's telephone number and reviewed by case agents. I confirmed that this call occurred with (414) 550-8124 by reviewing the court authorized pen register/trap and trace data for (414) 550-8124**.** Below is a transcription of the relevant portion of the call:

**CHS #1:** "I'm trying to get a… I'm trying to get a hold of one of my other guys too, because I had two people that asked me about it."

**MIRAMONTES:** (OV)[3]

**CHS #1:** "They both got some money right now… they both got…"

**MIRAMONTES:** "I'm going to tell you one thing about this bro, listen, bro, this really ain't shit. This is what I used to fuck with and shit. This is how it started off (UI) my nigga."

**CHS #1:** "Yeah."

**MIRAMONTES:** "This shit right here, nigga, on my life, you can grab this shit, even if they don't grab it, nigga, on my life, you know all the Mexicans that be doing (UI), them niggas doing meth, nigga."

**CHS #1:** "Yeah, yeah."

3 Herein, I use "OV" to note when multiple voices overlap and the conversation cannot be reliably transcribed.

**MIRAMONTES:** "These niggas do meth, bro. I'm going to tell you right now, you can piece that motherfucka out, nigga, you can make like two G's off a zip, nigga, it's nice meeting you, too. You can make like two G's, nigga, off that shit if you piece it out, which you don't have to do."

**CHS #1:** "Right."

**MIRAMONTES:** "I'm just letting you know and shit, and then, nigga, (UI) (OV)."

**CHS #1:** "How much does a zip… how much does a zip usually go for, though, that's what I'm saying like, if it was a good time?"

**MIRAMONTES:** "Last time I was fucking, last time I was fucking with all this shit when I had my plug, but this is like, we talking three years ago, four years ago and shit."

**CHS #1:** "Right, Right."

**MIRAMONTES:** "Zips was going for like three something."

**CHS #1:** "Right."

**MIRAMONTES:** "Like 350, that's how much zips was going for back like three, four years ago and shit. You know what I'm saying? Now I just, you know what I'm saying, dip my toes back in there to see what was going on then. You know what I'm saying?"

**CHS #1:** "Yeah."

**CHS #1:** "Well, give me like umm… like ten minutes to try to set something up."

**MIRAMONTES:** "Take your time (UI)."

**CHS #1:** "Because I know both, I know both of them got some bread, but if you talk about, if you can go, if you're going to go grab it today, and then…"

**MIRAMONTES:** "If I go grab it you gotta (UI)"

**CHS #1:** "If you get ready today, then I'll be able to link with you… I'll be able to link with you in the morning to grab it."

25

**MIRAMONTES:** "But you just gotta give me (OV)."

**CHS #1:** "But I want that nine for sure, but I got a lot of people, because I would have to collect from three different people. I got to get ahold of three different people."

**MIRAMONTES:** "Well, how about we do this? Look, how about we do this? If when they grab, you just give me a time frame and shit, if they want it, you let me know ahead of time, so I can start, you know what I'm saying, getting ready to go up there."

**CHS #1:** "That's what I'm saying, so I'm going to let you know within the next 10-15 minutes, because I know the gun for sure, I'll be able to get the money for that."

**MIRAMONTES:** "And then I was gonna say, with that, with that and shit, what's that called, just so that nigga don't get rid of it and shit, I'm going to call em and shit and I'ma to let that nigga know and shit. Like I'ma come grab it and then I'll just have it put up for you and shit, so that way it's solidified, it's there, it's locked in, you know what I'm saying?"

**CHS #1:** "Yeah."

**MIRAMONTES:** (OV UI)

**CHS #1:** "Well, yeah, I want that for sure, I want that for sure."

**MIRAMONTES:** "Ain't no reason, ain't no reason to be just letting that shit like that, lock up the money, no he don't, bro."

**CHS #1:** "If you could grab that, if you could grab that for me, because I want that for sure, so if you can grab that, just so you got it. But let me get a hold of this other motherfucka, bro, because I'm literally pulling up the dudes house right now."

**MIRAMONTES:** "Yeah, just give me a call back, buddy."

**CHS #1:** "Alright, I'll hit you in a second."

**MIRAMONTES:** "Alright, love."

**CHS #1:** "Love."

26

29.     Based upon my training and experience, I believe that in this call Miramontes has a connection to obtain methamphetamine and discusses previous prices of methamphetamine from several years ago ("Last time I was fucking, last time I was fucking with all this shit when I had my plug, but this is like, we talking three years ago, four years ago and shit." and "Zips was going for like three something."). Miramontes is looking for a commitment from CHS #1 to purchase the methamphetamine so Miramontes can pick it up ("Well, how about we do this? Look, how about we do this? If when they grab, you just give me a time frame and shit, if they want it, you let me know ahead of time, so I can start, you know what I'm saying, getting ready to go up there.")

30.     On April 29, 2025, at the request of case agents, CHS #1 placed a consensually recorded phone call to (414) 550-8124 at 12:41 PM and spoke with Miramontes to discuss the purchase of methamphetamine. The call was captured via the consensual recording of CHS#1's telephone number and reviewed by case agents. I confirmed that this call occurred with (414) 550-8124 by reviewing the court authorized pen register/trap and trace data for (414) 550-8124. Below is a transcription of the relevant portion of the call:

**MIRAMONTES:** "What's the word for my boy?"

**CHS #1:** "Alright, so I gotta move, but it's gonna take a lot of running around for me."

**MIRAMONTES:** "Wait, what, what do you gotta do?"

**CHS #1:** "Just, I gotta go, I gotta take a ride to go pick up money, it's pretty far."

**MIRAMONTES:** "Where you at?"

**CHS #1:** "Shit Illinois, like fucking, um, McKendree and shit."

**MIRAMONTES:** "How many, (OV) how many, (OV) how many should I grab?

**CHS #1:** "Grab, grab three, (OV) three zips of that."

**MIRAMONTES:** On a, uh, on a thing?"

<div align="center">27</div>

**CHS #1:** "Yeah… Alright… Three zips of that, and then the thing. I'ma got, I got twenty, I'm gonna have $2400 for you. I'm only making like $300 an shit. I need it."

**MIRAMONTES**: "I'm, I'm just going up, I'm just going up there because if I get this nigga on deck, nigga, I'm gonna try to sign a contract with this nigga, bro. And then that way, he gonna be locked in. He gotta make our shit for six months, nigga. And that way, niggas, we only spending like $300 some times (OV)."

**CHS #1:** "This dude, this dude told me if, if it's what you, what you claim it is, then, then, he got it, bro. He, he basically just trying to find something that's worth it. He was telling me…"

**CHS #1:** "Alright, bet. Well yeah, I'll take three of them if you can get it today. And then in the morning, I can meet with you and grab em. I'll have 24 for you."

**MIRAMONTES:** "Alright."

**CHS #1:** "I'll take all three of those and the thing. But I need you to get it all on order today if you can. So then, just get it out the way first thing tomorrow cuz I'm gonna have to meet dude out at Gurney to bring the shit."

**MIRAMONTES:** "Okay, okay, okay, so you meeting him halfway?"

**CHS #1:** "Yeah, so..."

**MIRAMONTES:** "Okay, okay."

**MIRAMONTES:** "Look, when you grab it, bro, when, when I put it in your hand and shit, bro, don't leave it, don't hold it in your hand, nothing and shit. Cuz that shit will burn your shit, it'll burn your skin, bro."

**CHS #1:** "Okay, okay bet."

**MIRAMONTES:** "So be, like you gotta be careful with that shit, bro and on my life… (OV)."

28

**CHS #1:** "This type of shit I need to know. That's what I'm saying, I don't know shit about it."

**MIRAMONTES:** "If you had, like, If you're holding one in your hand for too long and shit, it'll burn your skin. Cuz it's all chemicals, that's what it's made out of. It's all chemicals, It's man-made. You know what I'm saying, but… nigga, it's basically, this is basically another form of selling crack for way cheaper and the crack lasts way longer."

**CHS #1:** "Right."

**MIRAMONTES:** "The meth lasts way longer than the crack. That's basically what you're dealing with right now…"

**CHS #1:** "Ah yeah, for sure, for sure."

**MIRAMONTES:** "You look at it like that. Hey, but listen, bro, they be smacking niggas over the head for this shit too."

**CHS #1:** "That's what I'm saying, that's why I'm only, like, I'm trying to keep this shit between the person I'm getting it from and the person I'm giving it to. Cuz I ain't doing too much, I don't want nobody to see me."

**MIRAMONTES:** "Nah, for real nigga. I done seen niggas get, nigga, 20 pieces, nigga. Dub pieces, nigga?"

**CHS #1:** "Yeah, that's what I'm saying. I don't, I don't… that's why, that's why I wouldn't even have stuck my neck out there if I ain't, you know what I'm saying, if I ain't feel comfortable to do it. But I don't…"

**CHS #1:** "I feel you, hell yeah, that's… Bro, any drugs right now, they're smacking damn near because everything coming with the fetty. So it's just like, it's dangerous out here, bro, I already know."

**MIRAMONTES:** "Well, let me get this nigga, I'm gonna give this nigga a call and then after, I'm going to call this nigga with this little toy and then after that, I'm going to get you a call back… Or you call me back."

31.     Based upon my training and experience, I believe that in this call CHS #1 is requesting three ounces of methamphetamine along with the previously discussed firearm ("Yeah… Alright… Three zips of that, and then the thing. I'ma got, I got twenty, I'm gonna have $2400 for you. I'm only making like $300 and shit. I need it."). Miramontes tells CHS #1 that Miramontes will go pick up the narcotics ("Alright, then I'm gonna go ahead and I'm gonna call him right now and I'm damn near finna jump on the road in like 30 minutes to an hour then"), and he later tells CHS #1 the potency of the methamphetamine ("If you had, like, If you're holding one in your hand for too long and shit, it'll burn your skin. Cuz it's all chemicals, that's what it's made out of. It's all chemicals, It's man-made. You know what I'm saying, but… nigga, it's basically, this is basically another form of selling crack for way cheaper and the crack lasts way longer."). The deal is arranged to occur the following day on April 30, 2025 ("Alright, bet. Well yeah, I'll take three of them if you can get it today. And then in the morning, I can meet with you and grab em. I'll have 24 for you." and "alright").

32.     On April 29, 2025, at the request of case agents, CHS #1 placed a consensually recorded phone call to (414) 550-8124 at 2:56 PM and spoke with Miramontes to discuss the purchase of methamphetamine. The call was captured via the consensual recording of CHS#1's telephone number and reviewed by case agents. I confirmed that this call occurred with (414) 550-8124 by reviewing the court authorized pen register/trap and trace data for (414) 550-8124. Below is a transcription of the relevant portion of the call:

**MIRAMONTES:** "Whats the word? Let me know something."

**CHS #1:** "Shit, I was just seeing if you made a move yet"

**MIRAMONTES:** "yeah, I'm already packed up. I'm already about to jump off the freeway. I'm on my way over there."

**CHS #1:** "Alright, so you're going to grab the three of them, right? Did you put that thing to the side?"

**MIRAMONTES:** "Yeah. I just got to go grab that. I just got to grab it from him, though. I ain't even going to pick it up. But he got it put to the side. I already gave him half the cheese."

**CHS #1:** "Alright, but yeah, because I'm going to need the three and that for sure. So I just got to where I got to go to pick up the money."

**MIRAMONTES:** "I'm heading out to... What's that called? I'm going to head out to Wausau right quick, and then that way when I come back, I can just pick that. I'm going give dude the rest of the money and pick that up on my way back. And then that way I ain't got to ride with it up there. You know what I'm saying and bring it with me as soon as I move."

33.  Based upon my training and experience, I believe that in this call Miramontes tells CHS #1 that Miramontes is about to leave and travel to Wausau, Wisconsin, to obtain the methamphetamine ("I'm heading out to... What's that called? I'm going to head out to Wausau right quick, and then that way when I come back, I can just pick that. I'm going give dude the rest of the money and pick that up on my way back. And then that way I ain't got to ride with it up there. You know what I'm saying and bring it with me as soon as I move."). Miramontes indicates that Miramontes has already set aside the firearm for CHS #1 by giving the gun source half of the money ("I'm heading out to... What's that called? I'm going to head out to Wausau right quick, and then that way when I come back, I can just pick that. I'm going give dude the rest of the money and pick that up on my way back. And then that way I ain't got to ride with it up there. You know what I'm saying and bring it with me as soon as I move." and "But he got it put to the side. I already gave him half the cheese").

31

34.     On April 29, 2025, at the request of case agents, CHS #1 placed a consensually recorded phone call to (414) 550-8124 at 5:39 PM and spoke with Miramontes to discuss the purchase of methamphetamine.  The call was captured via the consensual recording of CHS#1's telephone number and reviewed by case agents.  I confirmed that this call occurred with (414) 550-8124 by reviewing the court authorized pen register/trap and trace data for (414) 550-8124.  Below is a transcription of the relevant portion of the call:

**MIRAMONTES:** "Yo"

**CHS #1:** "You ah, what up, you…"

**MIRAMONTES:** "Yeah."

**CHS #1:** "You… out there already, you in motion?"

**MIRAMONTES:** "Yeah, I'ma, I'ma, I'ma at what's that called right now…"

**CHS #1:** (UI)

**MIRAMONTES:** "I'm at, I'm at Steven's, I'm at Steven's Point."

**CHS #1:** "Alright, Bet."

**MIRAMONTES:** "I had to stop (UI) for more gas, I'ma finna be there in like 40 mins?"

**CHS #1:** "Alright bet, I was just checking to make sure you good, bro."

**MIRAMONTES:** "Hmm-huh, as soon as I get it… I'm finna Facetime you, show you that shit."

**CHS #1:** "Alright cool, (UI) let me know. I'll a, I'm here, I'll be by my phone."

**MIRAMONTES:** "Say less, bro."

**CHS #1:** "Love."

**MIRAMONTES:** "Love."

35.     Based upon my training and experience, I believe that in this call Miramontes tells CHS #1 that Miramontes is on his way to obtain the methamphetamine from the Wausau area ("I'm

32

at, I'm at Steven's, I'm at Steven's Point." and "I had to stop (UI) for more gas, I'ma finna be there in like 40 mins?").

36.        On April 30, 2025, at the request of case agents, CHS #1 placed a consensually recorded phone call to (414) 550-8124 at 9:20AM and spoke with Miramontes to discuss the purchase of methamphetamine and the firearm.  The call was captured via the consensual recording of CHS#1's telephone number and reviewed by case agents.  I confirmed that this call occurred with (414) 550-8124 by reviewing the court authorized pen register/trap and trace data for (414) 550-8124. Below is a transcription of the relevant portion of the call:

**CHS #1:** (UI)

**MIRAMONTES:** "Hello"

**CHS #1:** "(UI) What up?"

**MIRAMONTES:** "What's the word my boy?"

**CHS #1:** "Man, just go up, you?"

**MIRAMONTES:** "Shit, I'm right now, on my way back and shit. Shooting back to the Mil, just stopped at the gas station and grabbed some gas."

**CHS #1:** "You end up grabbing everything?"

**MIRAMONTES:** "Yeah, I got everything on deck, I sent you a picture and everything."

**CHS #1:** "Damn, I just woke up, looks at the phone, my bad."

**MIRAMONTES:** "Yeah, I, I got it on deck and shit, but I ain't gonna lie bro, I went up, I went in that niggas house, that nigga got that shit in there dog."

**CHS #1:** "For real?"

**MIRAMONTES**: "That nigga been in there cookin, he already got it cut. Though the nigga didn't want to do nothin for me and shit, damn hold on let me call you back because I'm suppose to be in court right now."

<div align="center">33</div>

**CHS #1:** "(UI)

**MIRAMONTES:** "I'ma do this zoom call and them I'm call you right back."

**CHS #1:** "Alright, bet."

**MIRAMONTES:** "Alright, love."

**CHS #1:** "Love."

37.     Based upon my training and experience, I believe that in this call Miramontes tells CHS #1 that Miramontes is on his way back to Milwaukee from Wausau ("Shit, I'm right now on my way back and shit. Shooting back to the Mil. I just stopped at the gas station to grab some gas.") and Miramontes obtained the methamphetamine and firearm ("Yeah, I got everything on deck."). In this context, I believe "Mil" is an abbreviation for Milwaukee. I confirmed with publicly available online court records that Miramontes had a video court appearance for Milwaukee County Circuit Court scheduled for 8:20AM on April 30, 2025.

38.     I reviewed court-authorized location data (pings) for (414) 550-8124 and learned that the device did not travel to Wausau, Wisconsin, and, in fact, never left the greater Milwaukee area. Based on my knowledge of drug prices and the controlled buys conducted in this investigation, I believe that Miramontes provided false information to CHS #1 about the source of the methamphetamine in order to justify charging CHS #1 an inflated price for the methamphetamine. A review of the court authorized pen register/trap and trace records for (414) 550-8124 revealed that (414) 550-8124 had multiple connected voice calls with (618) 681-7663 (Sawyer) just prior to initially contacting CHS #1 during the morning hours of April 30, 2025. (414) 550-8124 also had several connected voice calls with (262) 606-0209 (Roy) in the afternoon hours of April 29, 2025. Based on my training and experience, and knowledge of this investigation, I believe it likely that Miramontes was contacting Sawyer and Roy to obtain methamphetamine to sell to CHS #1 while representing to CHS #1 that Miramontes' source was in Wausau.

39.     On April 30, 2025, at the request of case agents, CHS #1 placed a consensually recorded phone call to (414) 550-8124 at 9:44AM and spoke with Miramontes to discuss the purchase of methamphetamine and the firearm.  The call was captured via the consensual recording of CHS#1's telephone number and reviewed by case agents. I confirmed that this call occurred with (414) 550-8124 by reviewing the court authorized pen register/trap and trace data for (414) 550-8124. Below is a transcription of the relevant portion of the call:

MIRAMONTES: "Yo."

CHS #1: "Yo"

MIRAMONTES: "What's the word?"

CHS #1: "Shit, fucking dropped my son off at school."

MIRAMONTES: "Alright, ah what's that called, I'm calling this nigga right now, shit I'm trynna, trynna get this smack on deck and shit, but I'm tryin to go pick up this heat and shit, then I can just fly over there and we get this done as soon as possible."

CHS #1: "Alright, yeah, yeah let's do that, umm… Let me know as soon you got it in hand and then ah, I just got one last…"

MIRAMONTES: "I got the other shit, you got, you got ah, you  got Facetime, right?"

CHS #1: "Ah, nah, this a Android."

MIRAMONTES: "Damn, ah, Facetime me on Facebook right quick."

CHS #1: "Alright, bet."

MIRAMONTES: "Alright, love.

40.     Based upon my training and experience, I believe that in this call Miramontes is attempting to contact his source to obtain a firearm ("Alright, ah what's that called, I'm calling this nigga right now, shit I'm trynna, trynna get this smack on deck and shit, but I'm tryin to go pick up this heat and shit, then I can just fly over there and we get this done as soon as

35

possible."). Miramontes requests CHS #1 to Facetime Miramontes so Miramontes can show CHS #1 the methamphetamine.

41. On April 30, 2025, CHS #1 contacted Miramontes via Facebook Facetime audio/video call at 9:46AM, as requested by Miramontes during their connected voice call that occurred at 9:44AM. Case agents were not present during the video call, and it was not recorded on CHS#1's phone. However, CHS #1 recorded the video conversation with another device and provided that recording to case agents. I reviewed the recording and observed that Miramontes showed CHS #1 the methamphetamine. During the video, Miramontes appears to be the passenger in a vehicle and a female can be heard ordering food through a drive through. During the conversation, Miramontes says "dude messaging me right now" in reference to the Stoger 9mm firearm that Miramontes is supposed to obtain. Miramontes is clearly identifiable in the video recording. I reviewed the court authorized Facebook pen register/trap and trace for Miramontes' social media account and confirmed the call took place with CHS#1. I also found the person Miramontes is referring to regarding the firearm has the display name "Juan Arias" with Facebook URL https://www.facebook.com/profile.php?id=100010081931714&_rdr. I believe this to be in reference to the Stoger 9mm pistol transaction that eventually fell through.

42. On April 30, 2025, at the request of case agents, CHS #1 placed a consensually recorded phone call to (414) 550-8124 at 10:47AM and spoke with Miramontes to discuss the purchase of methamphetamine and the firearm. The call was captured via the consensual recording of CHS#1's telephone number and reviewed by case agents. I confirmed that this call occurred with (414) 550-8124 by reviewing the court authorized pen register/trap and trace data for (414) 550-8124. Below is a transcription of the relevant portion of the call:

MIRAMONTES: "Yo. Yeah, bro, this bitch-ass nigga, bro. He's fucking... This nigga got me waiting and shit, bro."

36

**CHS #1:** "Are you waiting?"

**MIRAMONTES:** "Yeah, bro, because he at work and shit, but the nigga don't get off until like fucking 5 and shit, bro. And I'm telling this nigga, like, let me get the key. He don't want to let me get the key to go in the fucking crib and shit."

**CHS #1:** "Damn.

**MIRAMONTES:** "But, uh, what's that call? I forgot to tell you too, shit. I don't know if bro told you, but you know I got my hand on a hold of one of those switches, right?"

**CHS #1:** "Nah he didn't tell me."

**MIRAMONTES:** "Yeah I just got the button though, i don't got the smack on it.  I just got the button bro."

**CHS #1:** "How much you want for that?"

**MIRAMONTES:** "Like four."

**CHS #1:** "You got it with you?"

**MIRAMONTES:** "yeah, I got it with me its a metal one"

**CHS #1:** "Yeah I want it."

**MIRAMONTES:** "You want it?"

**CHS #1:** "Yeah fuck it."

**MIRAMONTES:** "I'm gonna bring it then I'm gonna bring that with too. Shit Im gonna get all this out the way the only thing is is I'm waiting on this nigga and shit cuz I already gave this nigga half the pay for that smack bro.

**CHS #1:** "Yeah, so what what time you think that?

**MIRAMONTES:** "That nigga don't get off til like 5 bro. I'm trying to do it when his bitch is there and shit, but the nigga won't... He acting funny like if a nigga trying to do something with his bitch or something."

**CHS #1:** "Oh, Man."

**MIRAMONTES:** "I got that button though."

**CHS #1:** " Yeah, but I'd rather get it, cause I actually dude paid for that thing too, shit. Let me know how we can do it, bro, cause I'd rather get it all done in one minute."

**MIRAMONTES:** "[UI] break that nigga's house and try to grab that. I Swear to God bro cause I'm...Bro, this shit is all fucked up and shit, but I ain't gonna lie and shit, cause I thought the nigga... I didn't know that the nigga was gonna be at work all fucking day and shit."

**CHS #1:** "Yeah"

**MIRAMONTES:** " I was like, I wanna just grab it and put it somewhere else, but... I ain't wanna drive all the way up to fucking Wausau with that shit. Yeah, for sure."

**CHS #1:** "Yeah for sure, that would be stupid."

**MIRAMONTES:** "You want me to bring that switch with though?"

**CHS #1:** "Yeah I want that."

**MIRAMONTES:** "I could bring that. I ain't gonna lie. These motherfuckers ain't...Too much, I ain't gonna lie to you, but I got my hand on that motherfucker, and it's there. I got it in a little baggie. It's a metal one. It ain't no plastic one. This ain't no throwaway and shit. So you can literally get this motherfucker and find somebody that 3D prints, and you can go make like 50 of them bitches, nigga, and you can sell them for a hundred a piece."

**CHS #1:** "It's like, yeah, like you said, you gotta have the one to make it, huh? It's the metal one too?"

**MIRAMONTES:** "It's a metal one, yeah. It's a motherboard. So basically, you can use this motherfucker all the way through, nigga, and get...You can basically charge motherfuckers to 3D print that motherfucker if you really wanted to."

**CHS #1:** "Right okay."

38

**MIRAMONTES:** "Or you could just 3D print like 50, 60 of them because you got the original one.

**CHS #1:** "Right."

**MIRAMONTES:** "And then, bang, as soon as you 3D print them, you sell them bitches. $200 a piece or $100 a piece. They're gonna buy them regardless because they want a switch on their shit."

**CHS #1:** "Yeah for sure. So shit, if we... Damn, man, ain't no way we could get all three of them because I want that, that, that, and that shit."

**MIRAMONTES:** "Thats what I'm trying to do. I got two of the shits on deck right now, nigga. I got the button and and got the Tina and shit. Only thing I'm waiting on is this bitch ass nigga."

**CHS #1:** "That's what I'm saying. So shit, try to see how we can do it so we can get all of it out the way at one time because I don't want to go back and forth. You know what I'm saying? I got somebody paved too. So just let him know, shit, if I gotta wait till five, then I guess I gotta wait till five, shit."

**MIRAMONTES:** "But if I want to do it, I'm trying to do it before then because, nigga, them troopers be right there at that time."

**CHS #1:** "Yeah, you're right."

**MIRAMONTES:** "They be right there, nigga, when them... at least, I'm gonna at least try to get it to where it's like we're traffic jams so that way I can blend in with all the other cars and shit because I know they're not gonna be paying attention as much, bro. There's gonna be too many cars out there for them to be paying attention and shit."

**CHS #1:** "Right."

39

**MIRAMONTES:** "Call my phone and shit, bro. Yeah, because bro at his little job shit, so just hit me up and shit. Matter of fact, we'll...

**CHS #1:** "Oh, bro at the job."

**MIRAMONTES:** "He at the job. He got a little job and shit now too. But look, hey, what's that called? Tap my line and shit when we dealing with this and shit and then whenever you... If you dealing with the blues or with the girl and shit on the girl's side and shit, you can just tap bro.

**CHS #1:** "Yeah, yeah, for sure."

43. Based upon my training and experience, I believe that in this call Miramontes has a switch/auto sear available to sell ("...I don't know if bro told you, but you know I got my hand on a hold of one of those switches, right?") and gives CHS #1 a price of $400 ("Like four."). Miramontes is waiting for his cousin to get off of work so Miramontes can obtain the firearm ("... because he at work and shit, but the nigga don't get off until like fucking 5 and shit, bro…"). Miramontes explains to CHS #1 that the switch is made of metal as opposed to 3D printed plastic ones ("...It's a metal one. It ain't no plastic one. This ain't no throwaway and shit. So you can literally get this motherfucker and find somebody that 3D prints, and you can go make like 50 of them bitches, nigga, and you can sell them for a hundred a piece…"). Miramontes explains that he has the machinegun conversion devices and the crystal methamphetamine but is waiting to acquire the firearm ("Thats what I'm trying to do. I got two of the shits on deck right now, nigga. I got the button and and got the Tina and shit. Only thing I'm waiting on is this bitch ass nigga.) Based on my training and experience, I am familiar with "Tina" as a term used to describe crystal methamphetamine.

44. On April 30, 2025, CHS #1 received an incoming call from (414) 550-8124 at 12:33PM and spoke with Miramontes to discuss the purchase of methamphetamine and the firearm.

40

The call was captured via the consensual recording of CHS#1's telephone number and reviewed by case agents.   I confirmed that this call occurred with (414) 550-8124 by reviewing the court authorized pen register/trap and trace data for (414) 550-8124**.** Below is a transcription of the relevant portion of the call:

**MIRAMONTES:** "Yo"

**CHS #1:** "Yo."

**MIRAMONTES:** "I gotta fucking, I gotta look for a heat right quick bro cuz this nigga just Apple paid me my pay back."

**CHS #1:** "Damn, for real."

**MIRAMONTES:** "Yeah, nigga, he acting like a little bitch, bro."

**CHS #1:** "Damn"

**MIRAMONTES:** "It kinda fucking me up too nigga, cuz I was trying to get that nigga, I was gonna put the fuckin button on that motherfucka so they just not separate and shit."

**CHS #1:** "Yeah."

**MIRAMONTES:** "But know I'm just riding around with that shit, nigga. Yeah, now I'm just riding around with that button and I'm riding around with that shit on me and shit, bro. This shit fuckin me up."

**CHS #1:** "Damn, you think you gonna be able to find one real quick?"

**MIRAMONTES:** "Yeah, I got my cousin already lookin, he said somebody hit him up earlier and said that they had umm, they had ah, ah Kel-Tech 9 on deck. So I told em (UI)."

**CHS #1:** "Man, at this point I don't even care what it is, cuz this umm, dude just (UI)."

**MIRAMONTES:** "I told him to ah, I told him to get back to me, he said alright. He said he's lookin right now and shit, he said he had a Kel-Tech 9 so."

**CHS #1:** "Alright."

**MIRAMONTES:** "I'ma tryin to grab something so that way I can bring something up there too and shit."

**CHS #1:** "Alright."

**MIRAMONTES:** But ah, what's that called, if you wanna Facetime I'll show you what this button looken like and shit so you get the gist of it."

**CHS #1:** "Alright, shit umm…"

**MIRAMONTES:** "Jump on Facebook and Facetime me right quick."

**CHS #1:** "Alright, bet."

**MIRAMONTES:** "Alright, love."

45. Based upon my training and experience, I believe that in this call: Miramontes no longer has access to the Stoger 9mm firearm originally discussed ("I gotta fucking, I gotta look for a heat right quick bro cuz this nigga just Apple paid me my pay back.") and the original source gave Miramontes his money back. Miramontes is actively trying to source another firearm for CHS #1 ("Yeah, I got my cousin already looking, he said somebody hit him up earlier and said that they had umm, they had ah, ah Kel-Tech 9 on deck. So I told em (UI).""). Case agents obtained Miramontes' Apple pay records and did not observe any transactions since November 2024.

46. On April 30, 2025, CHS #1 contacted Miramontes via Facebook Facetime audio/video call at 12:36PM, as requested by Miramontes during their connected voice call that occurred at 12:33PM. Case agents were not present during the video call, and it was not recorded on CHS#1's phone. However, CHS #1 recorded the video conversation with another device and provided that recording to case agents. I reviewed the recording and observed that Miramontes showed CHS #1 the switch/auto sear device. Miramontes again appears to be the passenger of a vehicle, and a female can be heard in the background. While Miramontes is talking about still waiting for the firearm, he tells CHS #1 that "He calling me right now so let me call you right

42

back." Miramontes is clearly identifiable in the video recording. I reviewed the court authorized pen register/trap and trace records for (414) 550-8124 and observed Miramontes received an incoming call from (414) 800-8131 at 12:37PM. Through law enforcement databases I determined that the phone number is likely utilized by Mohamed Zormati.4

47.        On April 30, 2025, at the request of case agents, CHS #1 placed a consensually recorded phone call to (414) 550-8124 at 1:12PM and spoke with Miramontes to discuss the purchase of methamphetamine and the firearm. The call was captured via the consensual recording of CHS#1's telephone number and reviewed by case agents. I confirmed that this call occurred with (414) 550-8124 by reviewing the court authorized pen register/trap and trace data for (414) 550-8124. Below is a transcription of the relevant portion of the call:

> **MIRAMONTES:** "So, did you get my message?"
>
> **CHS #1:** "Yeah, how much?"
>
> **MIRAMONTES:** "The nigga wants 15 for that bitch, but it's that. I can send you a picture of it right now. It's slime green. It's custom. I ain't gonna lie. I'm gonna send you a picture of it."
>
> **CHS #1:** "You can get it like ASAP too?'
>
> **MIRAMONTES:** "I can get it like right now. I'm gonna send you a picture of it. I'm gonna send you a picture of it. Whoever's gonna grab it, they're gonna want it [UI]. Hold on, stay on the phone.
>
> I just sent it to you right now. That's what it's coming like.
>
> **CHS #1:** "You sent it on Messenger or through the text?"
>
> **MIRAMONTES:** "Yeah, it's on there."

---

4 Zormati is not being listed as a TARGET SUBJECT as case agents are not aware of his potential involvement or role in the Apkarian DTO.

43

**CHS #1:** "Alright, let me make a call real quick. What's it shoot?

**MIRAMONTES:** "I think it shoots multi-cal 556s and 223s, I think."

**CHS #1:** "So, I just want to make sure like... Let me see. Let me do my math real quick. 1,800 plus… 3,700?"

**MIRAMONTES:** "Yeah, and then I'll get... What's that called? I'll just knock off 50 for the button and shit. Because I know it's supposed to be a [UI] and shit, but…"

**CHS #1:** "Alright, let me see what I can do real quick."

**MIRAMONTES:** "Alright, because I want you to make some pay, too. So, I'm gonna knock off 50 for the button and shit."

**CHS #1:** "Alright, let me see real quick.

**MIRAMONTES:** "Alright, love."

48. Based upon my training and experience, I believe that in this call Miramontes is offering CHS #1 a different firearm similar to an AR-15 type weapon ("...I think it shoots multi-cal 556s and 223s, I think…") and ("...The nigga wants 15 for that bitch, but it's that. I can send you a picture of it right now. It's slime green. It's custom…") for the price of $1500. Miramontes offers to drop the price of the switch/auto sear by $50 ("...I'll just knock off 50 for the button and shit…").[5]

49. I later obtained the image sent by Miramontes (through Facebook messenger) to CHS #1 that depicted an unknown person holding a black and lime green AR-15 style pistol.

50. On April 30, 2025, at the request of case agents, CHS #1 placed a consensually recorded phone call to (414) 550-8124 at 1:17PM and spoke with Miramontes to discuss the purchase of methamphetamine and the firearm. The call was captured via the consensual recording of CHS#1's telephone number and reviewed by case agents. I confirmed that this call occurred with

---

5 Based on my training and experience, I know that "button" is a common term used to refer to a machinegun conversion device also known as an autosear or a switch.

44

(414) 550-8124 by reviewing the court authorized pen register/trap and trace data for (414) 550-8124**.** Below is a transcription of the relevant portion of the call:

**MIRAMONTES:** "Yo"

**CHS #1:** "Yo, fuck it, grab it. How long you think till you get here?"

**MIRAMONTES:** "Shit ah, I'm finna call him right now and I'm finna see if I can go grab from them right now."

**CHS #1:** "Alright, let me know real quick."

**MIRAMONTES:** "Alright for sure, say less."

**CHS #1:** "Alright bet."

51.     Based upon my training and experience, I believe that in this call: CHS #1 agreed to purchase the AR-15 ("Yo, fuck it, grab it. How long you think till you get here?"), and Miramontes tells CHS #1 that Miramontes will arrange to get the weapon ("Shit ah, I'm finna call him right now and I'm finna see if I can go grab from them right now.").

52.     On April 30, 2025, CHS #1 received an incoming call from (414) 550-8124 at 2:06PM and spoke with Miramontes. The call was captured via the consensual recording of CHS#1's telephone number and reviewed by case agents. I confirmed that this call occurred with (414) 550-8124 by reviewing the court authorized pen register/trap and trace data for (414) 550-8124. Below is a transcription of the relevant portion of the call:

**MIRAMONTES:** "Yo, so there's good news and there's bad news."

**CHS #1:** "What's that?"

**MIRAMONTES:** "The good news is, we can still get it. The bad news is, we gotta wait for this motherfucka to get off to work too."

**CHS #1:** "What time they get off at?"

**MIRAMONTES:** "I think they get off at like 4."

45

**CHS #1:** "Well I'll wait, I just want to make sure I get all three at the same time."

**MIRAMONTES:** "We can… Yeah, I was gonna say, we can make do, we can make sure that for sure. It's whatever you wanna do, bro, I can bring you this shit too. And then I can bring the other shit all the way to you too and shit, wherever you wanna meet at and shit, it don't matter."

**CHS #1:** "Shit, if we can, can we just do all three at the same time, bro?"

**MIRAMONTES:** "Yeah, yeah, (UI)."

**CHS #1:** "I just picked up the cash, I just picked up the cash, ah, the other nine from this man. Well, he really gave me eight, I gotta cover the rest for him, but he said he's gonna give me a little bit more."

**MIRAMONTES:** "He liked that motherfucka, on what?"

**CHS #1:** "Yeah, it was, we finna just keep that for us."

**MIRAMONTES:** "That motherfucka (UI), I ain't gonna lie, I was finna grab that motherfucka too, dawg. I ain't gonna lie, bro, that motherfucka, it's got a nice ass color to it."

**CHS #1:** "Yeah, we finna just keep that for ourselves, bro. I like that rap, that motherfucka fire."

**MIRAMONTES:** "Yeah, that motherfucka (UI)…"

**CHS #1:** "Figure out what time you ah, gonna have everything and then let me know and then, shit, bro, I'm literally just spinning these motherfuckers, I got their money. But I gotta get, I'm trying to get all three at the same time, because, so I can just bust a move, bro. I'm just trying to get this shit out the way."

**MIRAMONTES:** "I got you for sure (UI). I'ma try to rush, I'ma try to rush they ass."

**CHS #1:** "Yeah, let me know exactly what time or whatever."

46

**MIRAMONTES:** "Alright (UI) and this is my cousin too, so I hope she don't be on no bullshit."

**CHS #1:** "Yeah, Yeah."

**MIRAMONTES:** "Usually, she usually be on top of it, so let me get up on her."

**CHS #1:** "Ah, yeah, get up on her and then tell her like is this for sure and then tell her you got a motherfucker waiting with the tape and then just…"

**MIRAMONTES:** "I'm gonna just tell her it's for me and shit, that I'm into some shit she's gonna like… that."

**CHS #1:** "Yeah, yeah, yeah. Try to rush it though, so you can get me a time, bro. Just so I can let these motherfucka know. Cause right now I'm just hanging they ass out to dry until I figure it out."

**MIRAMONTES:** "Right."

**CHS #1:** "Buddy with the meth he ain't trippin, I sent him the video, He's like, alright, bet."

**MIRAMONTES:** "He said that look fire too, or what?"

**CHS #1:** (UI)

**MIRAMONTES:** "When he see it in person, nigga, look, that little bag, the one that look like shake, when you see it, that's not really shake, bro. It's like, that's all little shards and shit."

**CHS #1:** "Right."

**MIRAMONTES:** "I wanted to keep the big shards separate from the little ones and shit."

**CHS #1:** "Right."

**MIRAMONTES:** "So he can see exactly how like that shit, if it's shaky, how it's gonna look. It's gonna look just like, still long ass shards in there. You gonna be like, oh yeah, this not really like shake, It's really little shards."

Case 2:25-mj-00908-NJ     Filed 05/16/25     Page 60 of 93     Document 1

**CHS #1:** "Right. Well, yeah, shit, let me know what time we can do all three then and I'll be ready."

**MIRAMONTES:** "For sure for sure."

**CHS #1:** "Alright, bet. And then, shit, if that don't fall through, just try to create something."

**MIRAMONTES:** "Yeah, I'm gonna try to, I'm gonna try to, if it don't fall through at that exact time, then I'm gonna try to make something like, I'm gonna try to, I know something gonna hit my phone, bro, by then, bro."

**CHS #1:** "Alright."

**MIRAMONTES:** My phone (UI), bro. Motherfuckas been trying to get rid of everything lately."

**CHS #1:** "Alright, bet. Well, yeah, let me know then. I'll be ready.

**MIRAMONTES:** "Look at this tart stopped in the middle of the street, he finna smack into the ambulance."

**CHS #1:** "Alright, let me know, bro. I'm gonna make a call too right now, so."

**MIRAMONTES:** "Alright, (UI)."

**CHS #1:** "Alright, love."

53.     Based upon my training and experience, I believe that in this call Miramontes is delaying the narcotics and firearm transaction until later in the afternoon because the source of the firearm is at work ("...The bad news is, we gotta wait for this motherfucka to get off to work too. I think they get off at like 4."). Miramontes describes the methamphetamine as being in crystal form ("When he see it in person, nigga, look, that little bag, the one that look like shake, when you see it, that's not really shake, bro. It's like, that's all little shards and shit."). Miramontes tells CHS #1 that he is obtaining the AR-15 from a female cousin ("Alright (UI) and this is my cousin too, so I hope she don't be on no bullshit." and "Usually, she usually be on top of it, so let me get up on her.").

48

54.     On April 30, 2025, at the request of case agents, CHS #1 placed a consensually recorded phone call to (414) 550-8124 at 2:55PM and spoke with Miramontes to discuss the purchase of methamphetamine and the firearm.  The call was captured via the consensual recording of CHS#1's telephone number and reviewed by case agents. I confirmed that this call occurred with (414) 550-8124  by reviewing the court authorized pen register/trap and trace data for (414) 550-8124. Below is a transcription of the relevant portion of the call:

**MIRAMONTES**: "Yo."

**CHS #1**: "You hear anything back?"

**MIRAMONTES**: "She ain't even message me back yet.  It's because, the last thing she texted me was that she at work."

**CHS #1**: "Does it sound like she up?"

**MIRAMONTES**: "Man, I was like, good looking. I'm going to throw you a zip. I was like, I'm going to throw you a zip for what's that [UI] called? For helping me out finding that shop. I was like, and a beer."  (*Miramontes is talking to someone else in the background*)

**CHS #1**: "Yo."

55.     Based on my training and experience, I believe in this call: Miramontes has not heard back from the female at work to obtain the firearm ("She ain't even message me back yet.  It's because, the last thing she texted me was that she at work.").  During the call, Miramontes is speaking to somebody else in the background regarding narcotics ("Man, I was like, good looking. I'm going to throw you a zip. I was like, I'm going to throw you a zip for what's that [UI] called? For helping me out finding that shop. I was like, and a beer.")

56.     On April 30, 2025, CHS #1 received an incoming call from (414) 550-8124 at 3:07PM and spoke with Miramontes.  The call was captured via the consensual recording of CHS#1's telephone number and reviewed by case agents.  I confirmed that this call occurred with

49

(414) 550-8124 by reviewing the court authorized pen register/trap and trace data for (414) 550-8124. Below is a transcription of the relevant portion of the call:

**MIRAMONTES:** "All right, my cousin says she'll be ready in an hour and then we and her can go grab it."

**CHS #1:** "All right, well then let me know when you're on the way then and I'll meet you.

**MIRAMONTES:** "All right, bet."

**MIRAMONTES:** "Where are you trying to meet at? Are you trying to meet like…

**CHS #1:** "Can you do the Pilot again?"

**MIRAMONTES:** "We can do the Pilot. We can do the Pilot."

**CHS #1:** "All right, well when you leave the Mil, let me know when you leave."

**MIRAMONTES:** "All right."

**CHS #1:** "All right, bet.

**MIRAMONTES:** "Say less. I'm going to let you know."

I'm going to call you when I'm on my way to her to go grab it and then that way I'm going to jump on the freeway, stop at the curb, and I'm going to slide over by you."

**CHS #1:** "All right, bet. Let me know when [UI] Just let me know beforehand so I can…"

**MIRAMONTES:** "Yeah, I'm going to let you know when I'm in motion so that way you can get ready too."

**CHS #1:** "All right, bet bro."

**MIRAMONTES:** "All right, love."

57.     Based upon my training and experience, I believe that in this call Miramontes is updating CHS #1 on the upcoming narcotics/firearm transaction ("All right, my cousin says she'll be ready in an hour and then we and her can go grab it."). Miramontes and CHS #1 agree to meet

50

at the Pilot Travel Center where similar transactions have occurred ("We can do the Pilot. We can do the Pilot.").

58.     On April 30, 2025, at the request of case agents, CHS #1 placed a consensually recorded outgoing call to (414) 550-8124 at 3:49PM and spoke with Miramontes. The call was captured via the consensual recording of CHS#1's telephone number and reviewed by case agents. I confirmed that this call occurred with (414) 550-8124 by reviewing the court authorized pen register/trap and trace data for (414) 550-8124. Below is a transcription of the relevant portion of the call:

**MIRAMONTES:** "Yo."

**CHS #1:** "Yo. Did you hear anything yet about, like, what time she's going to meet with you?"

**MIRAMONTES:** "She said it should be right now in about, like, 20 minutes. She said to give her an hour. That was, like, an hour ago."

**CHS #1:** "All right."

**MIRAMONTES:** "So, as soon as she meets up with me, she... And then I think it's going to go through for sure because she told me... I told her I got to get the money at the bank, so she told me to go grab it and shit."

**CHS #1:** "All right. Well, I'm about to go out to eat at, like, 5, so you might just have to bring everything up to where I'm at if that's cool."

**MIRAMONTES:** "That's fine. Where are you going to be at? How far? Texas Roadhouse. It's, like, right..."

**MIRAMONTES:** "It's a little bit closer to me."

**CHS #1:** "Yeah. You're just going to take another exit, a different exit."

**MIRAMONTES:** "Yeah. All right say less I got you, buddy."

51

**CHS #1:** "All right. So, let me know so we can figure it all out."

**MIRAMONTES:** "All right. For sure, I was going to say, just so... If I have to do that, just so we don't make things hot, I'm going to call you when I'm in there and shit. And then you just... You can just pop it in the trunk and shit, and I can throw it in the back or whatever and shit. However you want to do it."

**CHS #1:** "Yeah, you can throw it…"

**MIRAMONTES:** "You know what I'm saying? I just don't want to make it too hot and shit."

**CHS #1:** "I'll probably park in the back or something, and then, like, when you get there, just throw it in the trunk, and I'll come out and meet you with the bread or something."

**MIRAMONTES:** "All right."

**CHS #1:** "Just put... If you can't, just put everything in one bag so I'm not... If anything happens..."

**MIRAMONTES:** "Yeah, yeah. So you ain't got to... Yeah, you ain't all over the place. I already know, buddy. "

**CHS #1:** "All right bet. Just let me know when you are getting ready to hit the road, then, so I can be ready."

**MIRAMONTES: "**All right. Love."

**CHS #1:** "Love."

59.     Based upon my training and experience, I believe that in this call Miramontes is updating CHS #1 on the progression of the upcoming transaction ("She said it should be right now in about, like, 20 minutes. She said to give her an hour. That was, like, an hour ago"), and he is preparing to obtain the firearm to deliver to CHS #1.

60.     On April 30, 2025, at the request of case agents, CHS #1 placed a consensually recorded outgoing call to (414) 550-8124 at 4:43PM and spoke with Miramontes.  The call was

captured via the consensual recording of CHS#1's telephone number and reviewed by case agents. I confirmed that this call occurred with (414) 550-8124 by reviewing the court authorized pen register/trap and trace data for (414) 550-8124. Below is a transcription of the relevant portion of the call:

MIRAMONTES: "Last time, when I had it in last time, it looked kind of like, it looked kind of sus."

CHS #1: "Hell yeah. Well, shit, I should be done eating by the time you finish with everything."

MIRAMONTES: "Yeah, I wish it was earlier and shit, but shit, as long as it's going to get done though, that's all that matters. As long as it's, you know what I'm saying, I'm just happy that she, you know what I'm saying, everything's still good and shit, that she's still going to give me that."

CHS #1: "Alright, well, yeah, I'll be waiting for you then. I can meet you out at the Pilot then."

MIRAMONTES: "Alright, for sure. Say less."

CHS #1: "Alright, love."

MIRAMONTES: "Alright, love, bro."

61. Based upon my training and experience, I believe that in this call Miramontes is telling CHS #1 about the package the contraband will be delivered in ("Last time, when I had it in last time, it looked kind of like, it looked kind of sus"), as compared to the last firearm CHS #1 bought from Miramontes. Miramontes and CHS #1 agree to meet at the Pilot ("Alright, well, yeah, I'll be waiting for you then. I can meet you out at the Pilot then.").

62. On April 30, 2025, CHS #1 received an incoming call from (414) 550-8124 at 5:22PM and spoke with Miramontes. The call was captured via the consensual recording of

53

CHS#1's telephone number and reviewed by case agents. I confirmed that this call occurred with (414) 550-8124 by reviewing the court authorized pen register/trap and trace data for (414) 550-8124. Below is a transcription of the relevant portion of the call:

**MIRAMONTES:** "Yeah, I'm on my way to go pick it up right now, buddy."

**CHS #1:** "The gun?"

**MIRAMONTES:** "Yeah."

**CHS #1:** "Okay."

**CHS #1:** "Alright, so what do I do? How long until you get to the highway, then?"

**MIRAMONTES:** "She said it's not too far from the highway, so it's probably going to be like, literally after I pick it up, it's probably going to be like three minutes until I get to the highway, not even four."

**CHS #1:** "Alright, well text me when you get to the highway, then I'll let you know where I'm at." **MIRAMONTES:** "Alright, say less."

**CHS #1:** "Alright, buddy."

**MIRAMONTES:** "Alright, love."

63.     Based upon my training and experience, I believe that in this call Miramontes is on the way to obtain the firearm ("Yeah, I'm on my way to go pick it up right now, buddy." and "The gun?" and "yeah"). Miramontes indicates that when he obtains the firearm, he will be relatively close to the freeway ("She said it's not too far from the highway, so it's probably going to be like, literally after I pick it up, it's probably going to be like three minutes until I get to the highway, not even four.")

64.     On April 30, 2025, at the request of case agents, CHS #1 placed a consensually recorded outgoing call to (414) 550-8124 at 6:01PM and spoke with Miramontes. The call was captured via the consensual recording of CHS#1's telephone number and reviewed by case agents.

54

I confirmed that this call occurred with (414) 550-8124 by reviewing the court authorized pen register/trap and trace data for (414) 550-8124. Below is a transcription of the relevant portion of the call:

**MIRAMONTES:** "Yo"

**CHS #1:** "Yo"

**MIRAMONTES:** "I just, I'm, I'm waiting on her to come outside right now."

**CHS #1:** "Alright (UI)"

**MIRAMONTES:** "Yup, what's that called, she finna go ah, grab it an shit and then ah, she finna throw me some bullets on top of it too and shit, so."

**CHS #1:** "Alright, well yeah, shit let me know… (OV)"

**MIRAMONTES:** "Everything, Everything going good so far though my nigga, I got everything put together for you my boy."

**CHS #1:** "Alright, bet. Yeah, I'm leaving the Texas Roadhouse in like the next 10 minutes, so then, I just meet you at the Pilot."

**MIRAMONTES:** "Alright, for sure."

**CHS #1:** "Alright, let me know when you hit the highway so I can (UI)."

**MIRAMONTES:** "Alright, say less, love."

**CHS #1:** "Alright, love."

65.     Based upon my training and experience, I believe that in this call Miramontes is currently obtaining the firearm ("I just, I'm, I'm waiting on her to come outside right now") through his female cousin. Miramontes also tells CHS #1 that the cousin is going to throw in some ammunition for the weapon ("Yup, what's that called, she finna go ah, grab it an shit and then ah, she finna throw me some bullets on top of it too and shit, so.").

66.     On April 30, 2025, CHS #1 received an incoming call from (414) 550-8124 at 6:03PM and spoke with Miramontes. The call was captured via the consensual recording of CHS#1's telephone number and reviewed by case agents. I confirmed that this call occurred with (414) 550-8124 by reviewing the court authorized pen register/trap and trace data for (414) 550-8124. Below is a transcription of the relevant portion of the call:

**MIRAMONTES:** "Yo. Hey, you don't want to just post up right there and I can shoot to you?"

**CHS #1:** "Texas Roadhouse?"

**MIRAMONTES:** "Yeah, because you're right there by IKEA, right? By that Texas Roadhouse?"

**CHS #1:** "No, I'm at the one in Racine."

**MIRAMONTES:** "Oh, it's in Racine?"

**CHS #1:** "Yeah, I'm right here by Walmart in Racine. Like right off Durand, Highway 11."

**MIRAMONTES:** "Oh, yeah, yeah, yeah. Okay."

So I'll probably [UI]."

**MIRAMONTES:** "Alright, I'll meet you at the Pilot then."

**CHS #1:** "Alright, that's good."

**MIRAMONTES:** "Alright, love."

**CHS #1:** "Alright, bet love bro."

67.     Based upon my training and experience, I believe that in this call Miramontes is confirming the meeting location after being confused about which Texas Roadhouse CHS #1 is currently at ("Yeah, because you're right there by IKEA, right? By that Texas Roadhouse?"). Miramontes and CHS #1 again agree to meet at the Pilot ("Alright, I'll meet you at the Pilot then.").

56

68.  On April 30, 2025, at the request of case agents, CHS #1 placed a consensually recorded outgoing call to (414) 550-8124 at 6:28PM and spoke with Miramontes. The call was captured via the consensual recording of CHS#1's telephone number and reviewed by case agents. I confirmed that this call occurred with (414) 550-8124 by reviewing the court authorized pen register/trap and trace data for (414) 550-8124. Below is a transcription of the relevant portion of the call:

**MIRAMONTES:** "Yo"

**CHS #1:** "Yo, you on the way yet?"

**MIRAMONTES:** "Yup, I just, I just grabbed it, I'm finna drop her off, I'm finna drop my cousin off and then I'm on my way to you."

**CHS #1:** "Alright, so what you think, like 7 o'clock?"

**MIRAMONTES:** "Prolly like, yeah like 7, 7:20 at the latest."

**CHS #1:** "Alright, I'll be up there bro."

**MIRAMONTES:** "Alright, say less.

69.  Based upon my training and experience, I believe that in this call Miramontes is telling CHS #1 that Miramontes has obtained the AR-15 type firearm ("Yup, I just, I just grabbed it, I'm finna drop her off, I'm finna drop my cousin off and then I'm on my way to you.") and will be on his way to meet CHS #1.

70.  On April 30, 2025, at the request of Case agents, CHS #1 placed a consensually recorded outgoing call to (414) 550-8124 at 6:58PM and spoke with Miramontes. The call was captured via the consensual recording of CHS#1's telephone number and reviewed by case agents. I confirmed that this call occurred with (414) 550-8124 by reviewing the court authorized pen register/trap and trace data for (414) 550-8124. Below is a transcription of the relevant portion of the call:

57

**MIRAMONTES:** "Yup, I'ma on my, she just jumped out the way but I'm on my way to you know."

**CHS #1:** "Alright, bet. So (UI)"

**MIRAMONTES:** "(UI) I'm finna be jumping on a freeway, I'm prolly gonna be like, honestly, I'm prolly gonna be like 40 minutes cuz I'm coming from ah, Waukesha."

**CHS #1:** "Alright bro."

**MIRAMONTES:** "So…"

**CHS #1:** "I'll be ready then, I'll be up there."

**MIRAMONTES:** "Alright, say less.

**CHS #1:** "Alright (UI).

**MIRAMONTES:** "Alright, Love."

**CHS #1:** (UI)

71.     Based upon my training and experience, I believe that in this call Miramontes is telling CHS #1 that Miramontes just dropped off his female cousin ("Yup, I'ma on my, she just jumped out the way but I'm on my way to you know"), and that he is on his way to meet CHS #1 from the Waukesha area ("... I'm prolly gonna be like, honestly, I'm prolly gonna be like 40 minutes cuz I'm coming from ah, Waukesha.")

72.     On April 30, 2025, at the request of case agents, CHS #1 placed a consensually recorded outgoing call to (414) 550-8124 at 7:16PM and spoke with Miramontes. The call was captured via the consensual recording of CHS#1's telephone number and reviewed by case agents. I confirmed that this call occurred with (414) 550-8124 by reviewing the court authorized pen register/trap and trace data for (414) 550-8124. Below is a transcription of the relevant portion of the call:

**MIRAMONTES:** "Yo."

**CHS #1:** "Yo, (UI)."

**MIRAMONTES:** "Yup, I'm like 20 minutes out."

**CHS #1:** "Okay, bet. I was just making sure, I'ma headin out now then. I got like a 15 minute ride, so."

**MIRAMONTES:** "Yeah, nah, ah, what's that called, I'ma make sure I call you when I'm like 15 minutes out, no bullshit."

**CHS #1:** "Okay, yeah, umm… well shit, I'm a just umm, gonna hope in traffic soon, just let me know."

**MIRAMONTES:** "Alright, for sure."

**CHS #1:** "Alright, bet bro."

**MIRAMONTES:** "Alright, Love."

**CHS #1:** "Love"

73.     Based upon my training and experience, I believe that in this call Miramontes is updating CHS #1 with his estimated arrival time ( "Yup, I'm like 20 minutes out.").

74.     On April 30, 2025, at the request of case agents, CHS #1 placed a consensually recorded outgoing call to (414) 550-8124 at 7:42PM and spoke with Miramontes.  The call was captured via the consensual recording of CHS#1's telephone number and reviewed by case agents.  I confirmed that this call occurred with (414) 550-8124 by reviewing the court authorized pen register/trap and trace data for (414) 550-8124.  Below is a transcription of the relevant portion of the call:

**MIRAMONTES:** "Yo."

**CHS #1:** (UI)

**MIRAMONTES:** "I'ma be there in like 15, I'm in there in 15 minutes buddy."

**CHS #1:** "Alright, I'm here waiting, bro. Try to hurry up if you can (UI OV)"

**MIRAMONTES:** "The only reason, I would've been there already and shit but the only thing is, bro, I didn't see the motherfucking gas tank on E and shit, bro and I only had like 5 miles left and shit."

**CHS #1:** "Yeah, I'm here waiting bro, I gotta hurry up and get back, let me know."

**MIRAMONTES:** "Alright, I'm shooting to you (OV)"

**CHS #1:** "(UI) meet you on the side by Arby's"

**MIRAMONTES:** "Alright, I'm shooting to you."

**CHS #1:** "Bet"

**MIRAMONTES:** "Alright"

75.     Based upon my training and experience, I believe that in this call Miramontes is updating CHS #1 with his arrival time to the meeting location ("Yo, I'm gonna be there in like 15, Im in there in 15 minutes, buddy.")

76.     TFO Jason Baclawski and I met with CHS #1 at a predetermined location in Racine County.  I search CHS #1's vehicle and no drugs, weapons, or money were found.  TFO Jason Baclawski searched CHS #1, and no drugs, weapons, or money were found.  At approximately 7:21PM, TFO Jason Baclawski and I activated the audio/video recording devices on CHS #1 and provided CHS #1 with the $3650 in buy money. TFO Baclawski maintained constant moving surveillance of CHS #1 as CHS #1 drove from the predetermined meeting location to the parking lot of the Pilot Travel Center where physical surveillance was continued by the covert surveillance team.  At approximately 8:06PM, physical surveillance observed a black Honda Civic (APS3238) (hereinafter "Honda") pull into the Pilot parking lot and park next to CHS #1. Physical surveillance observed Miramontes exit the Honda and place a bag in the trunk of CHS #1's vehicle and then enter into the front passenger seat of CHS #1's vehicle.  Moments later, physical surveillance observed Miramontes exit CHS #1's vehicle and enter back into the rear seat of the Honda and leave the area

60

traveling eastbound on Northwestern Avenue. According to CHS #1, CHS #1 provided Miramontes with the $3650 in buy money inside the vehicle.

77. The following conversation between CHS#1 and Miramontes occurred while inside CHS#1's vehicle and was consensually recorded by CHS#1 and reviewed by case agents:

**CHS #1:** "It's all in the bag then?"

**MIRAMONTES:** "Yep, everything is all up in there."

**CHS #1:** "You came just in time bro, none of my chargers are working."

**MIRAMONTES:** "[UI] there was a State Trooper sitting there gunning us bro. We was speeding too, we was doing like 80."

**CHS #1:** "You taking all the blues man (CHS #1 is counting the money)."

**MIRAMONTES:** "I go right to the bank man and whats that called I swap them out."

**CHS #1:** "Yeah I usually take the dirty shit and give you all the clean shit. You said you owe me $50 right, you got a $50 on you?"

**MIRAMONTES:** "Think I got a $50 dollar bill on me. Here's 50."

**CHS #1:** "I'm let you know then, get home and check everything out."

**MIRAMONTES:** "Button in there..."

**CHS #1:** "Everything good?"

**MIRAMONTES:** "Every in there. I ain't gonna lie."

**CHS #1:** "I trust you bro."

**MIRAMONTES:** "I ain't gonna lie, when you open that motherfucker you gonna be happy as a bitch."

**CHS #1:** "I'm keeping that bitch, on god."

**MIRAMONTES:** "Watch, when you open that motherfucker, when they see that button, anybody that see that, nigga they [UI] gonna be hitting your line trying to get that button from you and they gonna try get the chop from you."

**CHS #1:** "I'm gonna let you know tonight."

**MIRAMONTES:** "Oh and I put some bullets in there for you."

**CHS #1:** "Which ones?"

**MIRAMONTES:** "The 223's"

78.     Based upon my training and experience, I believe that in this conversation Miramontes is confirming that the firearm, switch, and methamphetamine are all in the bag he placed in the trunk (""Yep, everything is all up in there."). Miramontes confirms that the machinegun conversion device is in there ("Button in there…"). Miramontes brags about the quality of the machinegun conversion device and firearm and suggests that if others see them they will try to purchase them from CHS#1 ("Watch, when you open that motherfucker, when they see that button, anybody that see that, nigga they [UI] gonna be hitting your line trying to get that button from you and they gonna try get the chop from you."). Miramontes also provided .233 caliber ammunition ("Oh and I put some bullets in there for you." and "The 223's").

79.     At 8:18PM, pole camera video shows Miramontes getting dropped off at 2322 Kae Court (Apkarian and K. Ramos' residence) by the Honda. Miramontes enters the residence through the garage and returns to the Honda approximately 20 minutes later and leaves the area.

80.     CHS #1 later met with case agents and turned over a quantity of suspected methamphetamine, a switch/auto sear, an American Tactical black and lime green AR-15 pistol (serial number MSA140678), and a baggie containing 22 rounds of .223 ammunition. Case agents reviewed the audio/video recordings and found them to be consistent with CHS #1's account of the

62

transaction. Miramontes is clearly seen on video however he had placed the bag of drugs/firearm/switch into the trunk of CHS #1's vehicle prior to getting inside.

81. Case agents later field tested and weighed the methamphetamine and found the total weight to be 85.6 grams and a Nark II field test kit revealed a positive reaction for the presence of methamphetamine. Case agents later test fired the AR-15 pistol and found it to be a functioning semi-automatic firearm. Case agents later test fired the machinegun conversion device (switch) provided by Miramontes and found that it converted a semi-automatic Glock 9mm into a fully automatic firearm.

82. I reviewed the court authorized pen register/trap and trace records for (414) 550-8124 as they pertain to the April 30, 2025, controlled buy operation. I found that (414) 550-8124 has had limited contact with (618) 681-7663 (Isaac Sawyer) during the prior 30 days with only sporadic contact until April 29, 2025. Between April 29, 2025, and April 30, 2025, (414) 550-8124 has 15 answered and unanswered voice calls with (618) 681-7663 (Sawyer). Additionally, prior to April 29, 2025, (414) 550-8124 has no contacts with (262) 606-0209 (Roy-**TARGET CELL PHONE**) since April 11, 2025. However, on April 29, 2025, and April 30, 2025, (414) 550-8124 had 11 answered and unanswered voice calls with (262) 606-0209 (Roy-**TARGET CELL PHONE**). Based on my training and experience, the context of the calls with CHS #1, and the court authorized pen register/trap and trace data, I believe that Miramontes contacted Sawyer and Roy to attempt to acquire methamphetamine to supply to CHS#1. Therefore, I believe that Roy and Sawyer are potential sources of supply for controlled substances.

83. Based on the aforementioned information, I believe that Roy, Apkarian and Miramontes are involved in drug trafficking. Moreover, I believe that Apkarian is using, and continues to use, (414) 550-7820, that Miramontes is using, and continues to use, 414-550-8124,

63

and that Roy was using 414-345-7141, and is now using, and continues to use 262-606-0209 **(TARGET CELL PHONE),** to help facilitate their drug trafficking activities.

84.     I believe that the historical location data requested will assist in identifying DTO stash locations and corroborating the locations of DTO members during relevant events such as the previously completed controlled buys.  I believe that the call detail records requested will help identify other DTO members and potential sources of supply.  I believe that the requested prospective location data will assist in proactive surveillance of DTO members and will aid in the identification of DTO members/suppliers, stash locations, and meeting locations.

85.     In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

### Cell-Site Data

86.     Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone

numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

87. Based on my training and experience, I know that Verizon also can collect per-call measurement data, which Verizon also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

88. E-911 Phase II / GPS Location Data

89. I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the Target Cell

65

Phone, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available.

<div align="center">**Pen-Trap Data**</div>

90.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

<div align="center">**Subscriber Information**</div>

91.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under

<div align="center">66</div>

investigation because the information can be used to identify the Target Cell Phone's user or users and may assist in the identification of co-conspirators and/or victims.

92. I have a general understanding of how the cellular telephone network operates. I am aware that cell sites (towers) are strategically placed by cellular service providers, to provide a seamless operation so people can travel virtually anywhere and make or receive an uninterrupted call, send or receive text messages, or initiate a data session via their cellular phone. Usually, cell sites will be mounted high on a large pole, building, or other structure which provides line of sight with the population below. Cell sites are typically divided into sectors, which are made up of antennas connected to cellular radio transceivers. Each sector is mounted on the cell site and faces a specific direction to provide maximum cellular coverage for the people in the area. The range of the cell site and sectors depends on many factors to include environmental and geographic factors and whether it is located in a highly populated, urban environment or desolate rural area. Cell site location information (CSLI) does not provide an exact location of a cell phone; the basic call detail record data only provides the physical location of the cell site (latitude and longitude) and a direction (azimuth) the antennas are facing from the cell site.

93. I am aware when a person either initiates or receives a voice call, text message, or a data session (usage event) from their cellular device, the device broadcasts signals to the cell site that routes its communications. These signals include a cellular device's unique identifiers as well as details about the usage event. I am also aware cellular service providers collect and store these usage event details (transaction records) associated with cellular phone numbers during the normal course of business. The usage event records, commonly referred to as call detail records, stored by their respective cell phone company, mostly contain the following information with some exceptions based on the specific carrier: Date, time, type of event, duration, phone number initiating the usage event (called, calling), even if caller identification is blocked by the calling party, text message

67

transaction data, the international mobile equipment identifier (IMEI), the international mobile subscriber identifier (IMSI), IP packet data session logs, and cell site location and sector information at the beginning and ending of each usage event.

94. I believe such information is relevant and material to the ongoing criminal investigation as it may provide investigators with information supporting or refuting the suspect's alibi, and assist with determining other unidentified co-conspirators, and/or show the general geographic location of the target device before, during, and after the commission of the crime. This is basic information and does not provide an exact location of the person's cell phone nor does it identify the other parties.

95. I am aware that obtaining and preserving historical cell phone call detail and specialized location records could also prove to be fruitful, as such records could assist investigators not only with identifying those who may have been in contact with the victim(s) or potential co-conspirators, but may also allow investigators other opportunities, including, but not limited to, confirmation or the disproving of alibis, statements, and other observations.

96. I know that these records such as those associated with the target phone, are not kept or preserved indefinitely by the cellular service providers and are purged at different intervals. Obtaining and preserving these records at this point in the investigation will ensure the investigators assigned to the case will have them available, and if the case were to go "cold", future investigators will have access to the records which would otherwise likely not be obtainable. Not only could the preserved records assist in proving one's guilt, they could also assist in proving one's innocence.

97. I am aware cellular service providers maintain specialized location records consisting of engineering data. These data sets are used by the providers to troubleshoot coverage areas and report back on potential dead spots, all with the intent to oversee and optimize the cellular network. Specialized location records typically contain data for every usage event, to include

68

technology details (e.g. voice, text, data), resource usage, and call failure information. They can also include data for incomplete calls (e.g. denied calls and set-up failures). These records not only include the basic call detail records, but also an estimation of the target phones location (Latitude and longitude) with a possible accuracy radius, and/or the distance from the cell site at the time of the usage event. Utilizing specialized location records can provide investigators with a much smaller footprint of a target phones location and could place a target phone within close proximity of a crime scene before, during and after a crime. Each carrier uses their own nomenclature to describe the technology used to obtain this data including: NELOS (Network Event Location System) – T-MOBILE, RTT (Round Trip Time/Return Trip Time/Real Time Tool) - Verizon &amp U.S. Cellular, PCMD (Per Call Measurement Data) – Sprint & U.S. Cellular, and TDOA (Time Difference of Arrival) or Timing Advance Information – T-Mobile & Metro by T-Mobile. I believe this information is relevant and material to the investigation as it provides supplemental geo-location information which, while not precise enough to identify a specific house, is accurate enough to provide block-level accuracy, in some cases. Investigators can use this information to correlate existing fact patterns and timelines to confirm or refute prior statements and/or evidence regarding the location of the target device.

98. I am seeking evidence of communication between identified subject(s) and previously unidentified individuals and entities. In my training and experience, associates communicate together via phone calls, text messages, and social media applications via data sessions and these communications most commonly occur on or through cellular devices.

99. In my training and experience individuals often use digital devices and cellular devices to post messages to others on social networking applications. In my training and experience it is possible for cellular phone users to use a variety of messaging platforms including the cellular SMS and MMS technology, as well as third-party applications like Facebook Messenger, WhatsApp,

69

Snapchat, iMessage, and many other applications. Therefore, I seek to search all the communication evidence maintained by the service provider.

100. I am also seeking evidence of association. I know that establishing the association of co-conspirators is important in proving a concert of action between multiple persons. In my training and experience, one of the most effective methods of linking co-conspirators together is by reviewing the call detail records maintained by the cellular service providers. In my training and experience, associates communicate together via voice calls, text messages and third-party applications by means of a data usage event, therefore I am seeking the call detail record evidence to demonstrate the associations of the individuals in this case. Because this evidence is intended to be used to show associations of the user/owner of the device and co-participants, I am seeking the above items regardless of the dates the information was created.

101. I am aware cellular service providers offer their customers optional free or paid backup digital storage for some of the content stored on their device. These services are offered to secure and restore their digital information in the event their mobile device is lost or stolen. Because these digital storage services are remote and transparent to the consumer, they are often referred to as 'cloud' storage. Customers can elect to digitally store the contents of their electronic phone book including details of their contacts, names, phone numbers, email addresses, and other data, calendar events, short message service (SMS) messages, commonly referred to as text messages, multimedia message service (MMS) messages, consisting of pictures, videos, and/or audio files with or without accompanying text, call logs of incoming, outgoing, and missed calls, digital images and videos, music and audio files, and electronic files such as documents and spreadsheets. I believe this information is relevant and material to the matter at hand as the contents of the remote digital storage may contain information presently unavailable to investigators including: associated identifying information from the user's contacts which would tend to identify possible suspect's, witnesses,

70

associates, and/or co-conspirators, the content of messages sent between those parties, digital images and videos which may contain evidence of the crime under investigation, and documents related to same.

102. I am aware cellular service providers maintain a master cell site list of all cell sites within their network. These cell site lists will include the specific switch, cell site number, name, physical address, latitude and longitude of the cell site, all sectors associated with each cell site, azimuth, and beam-width of each related sector. When reviewing call detail and specialized location records from the carriers, the records may only reference a specific switch, cell and sector, or LAC and CID/eNodeB ID, related to each usage event; they usually will not include the location (latitude and longitude) of the actual cell site and azimuth of the sector. It becomes necessary to reference a cell site list in order to plot the exact location of the cell site and to identify the azimuth of the sector used associated with specific usage events.

103. Also, in the course of the investigation and review of the call detail and specialized location records, it may become necessary to visualize all cell sites within a geographic region of interest, not just the cell sites used by the target phone. It is just as important to show cell sites not used by a target phone, as it is to show cell sites used. By obtaining the master cell site lists from the cellular service providers, investigators are able to plot all of the cell sites in a given region, helping investigators with disproving of alibis, statements, and other observations evidenced by the records.

104. I am seeking evidence of ownership, use, and identification of the subscriber, customer or owner of the electronic communication information contained in the records retained by the cellular service provider. I am aware, depending on whether the account is post-paid or pre-paid, a consumer must provide information to the cellular service provider. Post-paid accounts are credit based whereby a customer is provided service and then billed after the provision of services. These types of accounts require sufficient identifying information to enable the cellular service

71

provider to make a determination regarding credit worthiness and recourse in the event the consumer defaults on their contractual agreement. The information required by most cellular service providers include the customer's personal identifying information, verified using government issued identification or other means, residential address, alternate contact phone numbers, and electronic mail (email) address(es). Additional information can include the type of service plan, additional features subscribed to, such as cloud storage and additional phones on the same account, device type and unique identifiers including IMEI and IMSI, method and source of payment information including financial institution and direct billing checking account numbers, credit or debit card numbers, and/or third-party payment processors, and customer service representative account comments and notes. I believe this information is relevant and material to the matter at hand as it serves multiple purposes including: identifying the subscriber to the target phone number, providing investigators with additional information and leads including subscriber address, additional phone numbers, and/or email addresses, device identifiers used to correlate any seized phones with the account, previously unidentified phones subscribed to on the same account, and financial information. I know that ownership and control of a digital device can be placed at issue through a simple denial, "that is not my phone." In my training and experience some of the best ways to establish ownership and control are by reviewing account information and subscriber records from cellular service providers.

105.     I am aware of the ease of being able to purchase a pre-paid cellular phone, and how it has impacted law enforcement's effort when attempting to identify criminals and locate wanted felons. It becomes very difficult, sometimes impossible, to determine the identity of a subscriber when the pre-paid providers do not require the identity of the person when obtaining/purchasing a pre-paid cellular phone. From prior training and experience, I know of many cases where pre-paid phones were used by suspects to further facilitate their criminal behavior, with the intent of

72

concealing their true identity. Despite the lack of personally identifiable information, prepaid accounts can still provide investigators with information to identify the user. By examining the call detail and specialized location records of a pre-paid target phone, investigators can examine call and text incoming and outgoing usage events to help identify co-conspirators, associates, friends and family, who could help identify the party utilizing the pre-paid phone. Additionally, pre-paid services typically require some mechanism of payment including pre-paid cards, cash payments at retail establishments, or via an online portal. The financial information may assist investigators with identifying the locations where the pre-paid cards were purchased, the location of the retail establishments used for cash payments, and/or associated online account information and Internet Protocol (IP) addresses.

## AUTHORIZATION REQUEST

106.    Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

107.    I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

108.    I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

73

109.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

110.     Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

<u>**ATTACHMENT A**</u>

**Property to Be Searched**

1.  Records and information associated with the cellular device assigned **call number 262-606-0209** (referred to herein and in Attachment B as "the Target Cell Phone"), used by Trayveon Roy**,** that is in the custody or control of Verizon Wireless (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 180 Washington Valley Rd, Bedminster, NJ 07921.

2.  The Target Cell Phone.

Case 2:25-mj-00908-NJ    Filed 05/16/25    Page 88 of 93    Document 1

**ATTACHMENT B**

**Particular Things to be Seized**

**I.     Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.   The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period April 1, 2025, to the present:

    i.   Names (including subscriber names, user names, and screen names);

    ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii.   Local and long distance telephone connection records;

    iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    v.   Length of service (including start date) and types of service utilized;

    vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

    vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

    viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records

2

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone, including:

    1. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    2. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

    i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

    ii. Source and destination telephone numbers;

    iii. Date, time, and duration of communication; and

    iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical GPS/Mobile

3

Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

The Honorable Stephen C. Dries has also issued an order pursuant to 18 U.S.C. § 3123, dated April 25, 2025, for such information associated with the Target Cell Phone.

c. Information about the location of the Target Cell Phone for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

II.     **Information to be Seized by the Government**

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 21 U.S.C. §  841(a)(1), 843(b), and 846 involving Quentin Apkarian, Joey Miramontes, Trayveon Roy, and others known and unknown, during the period of April 1, 2025, to the present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are

4

authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

Case 2:25-mj-00908-NJ     Filed 05/16/25     Page 92 of 93     Document 1

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Verizon, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Verizon. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Verizon and they were made by Verizon as a regular practice; and

b. such records were generated by Verizon electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Verizon in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by Verizon, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____  _____
  Date                                                          Signature

1